[No. B154445. Second Dist., Div. Three. Dec. 6, 2002.]

In re DANNY H., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
DANNY H., Defendant and Appellant.

**COUNSEL**

Doris S. Browning, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Susan D. Martynec and Linda C. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CROSKEY, J.**—Danny H., a minor, appeals from the order continuing wardship (Welf. & Inst. Code, § 602) entered following findings that he committed misdemeanor vandalism (Pen. Code, § 594, subd. (a); count one), and possession of an aerosol container with intent to deface while on a public place (Pen. Code, § 594.1, subd. (e)(1); count two). He was ordered placed home on probation.

### INTRODUCTION

We conclude that whether a person was on a "public place" within the meaning of Penal Code section 594.1, subdivision (e)(1), is determined by examining the totality of the facts and circumstances and, in the present case, there was sufficient evidence that Danny H. violated that subdivision, including sufficient evidence that he was on such a "public place." We also hold that there is no need to decide Danny H.'s contention regarding Penal Code section 654, since that issue was relevant only to the calculation of a maximum theoretical period of confinement, and he was ordered placed home on probation.

### FACTUAL SUMMARY

1. *People's Evidence.*

Viewed in accordance with the usual rules on appeal (*In re Dennis B.* (1976) 18 Cal.3d 687, 697 [135 Cal.Rptr. 82, 557 P.2d 514]), the evidence established that about 5:20 p.m. on May 22, 2001, Azusa Police Corporal Randy Phillips, in response to a radio call about someone painting graffiti, was driving a marked patrol vehicle in the area of the 500 block of West Foothill. He observed Danny H. and another young man standing on the raised dirt area adjacent to railroad tracks and between two walls that paralleled the tracks. Danny H. was holding a bicycle. No one else was present. There was no sidewalk in that area, and the area was not one in which Phillips would have expected to see pedestrian traffic.

Danny H. and his companion fled the scene, but were later apprehended by another officer, Douglas Ernst. Phillips discovered a large amount of graffiti on "the wall," some of which had just been sprayed. The graffiti which had just been sprayed consisted of black and yellow paint. Several spray paint cans were in the area in which Danny H. and the young man had been standing. One of the cans had fresh black paint along its outside edge. The freshly painted black graffiti included the words "fuck school," and

"die." When Phillips first observed Danny H., Danny H. was about two feet from the vandalized wall, and about two feet from the "black spray paint" can. There were fingerprints on the back of the can.

After being detained, Danny H. denied any wrongdoing and claimed that he and his companion were on the trestle "because they were waiting for a friend. He didn't show up." Officer Ernst observed fresh black paint on Danny H.'s hands.

Following his arrest, Danny H. admitted to Officer Ernst that he and his friend had picked up spray cans that had been left on the trestle and Danny H. had spray painted words on the north and south sides of the trestle. Danny H. spray painted the words "Die Most," "Die," "Echo," and "BP." Echo was Danny H.'s Baldwin Park gang moniker, but he no longer associated with that gang. Danny H. said he wrote "Die Most" "on behalf" of his friend.

### 2. *Defense Evidence.*

In defense, Danny H. testified his friend did all the spray painting, and that he was "just standing there watching and sitting on my bike." He said that he had walked away when the police approached because he had always been told that being on the trestle was trespassing. He denied telling the police that he had spray painted the wall, but rather had told them that his friend did the spray painting. The paint on his hands came from painting model cars; however, he said that he did not tell that to the police that day because he was nervous. He said that he was not a member of the Baldwin Park gang at the time of adjudication, and was not a member on May 22, 2001.[1]

### CONTENTIONS

Danny H. contends: (1) "The true finding on count 2 must be reversed because there was no evidence [Danny H.] possessed any aerosol paint container with intent to deface 'while on any public highway, street, alley, or way, or other public place,' " and (2) "If the true finding on count 2 is valid, the sentence for that count should be stayed pursuant to Penal Code section 654."

---

[1]At the September 2001 adjudication, Danny H. displayed his hands to the court. They had paint on them and, according to Danny H., normally looked that way because Danny H. painted model cars. Danny H. was painting the day before the adjudication, and got blue paint on his fingers. The court looked at Danny H.'s hands and commented that "the middle right, the middle finger appears to have . . . some black substance on it."

## DISCUSSION

### 1. *There Was Sufficient Evidence That Danny H. Violated Penal Code Section 594.1, Subdivision (e)(1).*

Count two of the petition alleged in statutory language that Danny H. violated Penal Code section 594.1, subdivision (e)(1).[2] Following an adjudication, the court sustained counts one and two.[3] Danny H. presents no sufficiency claim as to count one. As to count two, he concedes there was evidence he possessed an aerosol paint can, he was immediately adjacent to the trestle wall, and he was using the can to spray paint the wall.

■ Danny H. disputes only that, as to count two, the requisite possession occurred while he was "*on any . . . public place*" within the meaning of section 594.1, subdivision (e)(1). He urges, inter alia, that there was no evidence as to the "ownership of the trestle, or of the ground immediately adjacent to the trestle wall. The only indication in the record as to the ownership of the location where the crimes allegedly occurred was the allegation of count 1 of the petition that the trestle belonged to Santa Fe Railway. Neither the trestle wall itself nor the area around it was proven to be a public place." The issue is one of first impression.

---

[2] Unless otherwise indicated, statutory references are to the Penal Code. Section 594.1, reads, in relevant part, "(a)(1) It shall be unlawful for any person, firm, or corporation, except a parent or legal guardian, to sell or give or in any way furnish to another person, who is in fact under the age of 18 years, any aerosol container of paint that is capable of defacing property without first obtaining bona fide evidence of majority and identity. [¶] . . . [¶] (b) It shall be unlawful for any person under the age of 18 years to purchase an aerosol container of paint that is capable of defacing property. [¶] (c) Every retailer selling or offering for sale in this state aerosol containers of paint capable of defacing property shall post in a conspicuous place a sign in letters at least three-eighths of an inch high stating: 'Any person who maliciously defaces real or personal property with paint is guilty of vandalism which is punishable by a fine, imprisonment, or both.' [¶] (d) It is unlawful for any person to carry on his or her person and in plain view to the public an aerosol container of paint while in any posted public facility, park, playground, swimming pool, beach, or recreational area, other than a highway, street, alley, or way, unless he or she has first received valid authorization from the governmental entity which has jurisdiction over the public area. [¶] . . . [¶] (e)(1) It is unlawful for any person under the age of 18 years to possess an aerosol container of paint for the purpose of defacing property while on any public highway, street, alley, or way, or other public place, regardless of whether that person is or is not in any automobile, vehicle, or other conveyance. [¶] (2) As a condition of probation for any violation of this subdivision, the court may order a defendant convicted of a violation of this subdivision to perform community service . . . . [¶] . . . [¶] (f) Violation of any provision of this section is a misdemeanor. Upon conviction of any person under this section, the court may, in addition to any other punishment imposed, if the jurisdiction has adopted a graffiti abatement program as defined in subdivision (f) of Section 594, order the defendant, and his or her parents or guardians if the defendant is a minor, to keep the damaged property or another specified property in the community free of graffiti, . . ."

[3] Count one alleged misdemeanor vandalism "under $400 damage" to a railroad trestle belonging to Santa Fe Railway, a violation of section 594, subdivision (a).

██ The rules of statutory construction are familiar. As our Supreme Court stated in *People v. Jefferson* (1999) 21 Cal.4th 86 [86 Cal.Rptr.2d 893, 980 P.2d 441], " 'The goal of statutory construction is to ascertain and effectuate the intent of the Legislature. [Citation.] Ordinarily, the words of the statute provide the most reliable indication of legislative intent. [Citation.] When the statutory language is ambiguous, the court may examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes. [Citations.]' [Citation.] ' "When the language is susceptible of more than one reasonable interpretation . . . , we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, . . . , and the statutory scheme of which the statute is a part." ' [Citation.]" (*People v. Jefferson, supra*, 21 Cal.4th at p. 94.)

██ Section 594.1, subdivision (e)(1), provides, "It is unlawful for any person under the age of 18 years to possess an aerosol container of paint for the purpose of defacing property *while on any* public highway, street, alley, or way, or other *public place*, regardless of whether that person is or is not in any automobile, vehicle, or other conveyance."[4] (Italics added.)

The meaning of the phrase "public place" in section 594.1, subdivision (e)(1), is ambiguous. Subdivision (e)(1), does not define the phrase, and the phrase, as a matter of common parlance, bears multiple meanings. The word "public," as an adjective, includes such meanings as "of or relating to a government," "of, relating to, or being in the service of the community or nation," "of or relating to people in general[,]" "general, popular," "of or relating to business or community interests as opposed to private affairs[,]" "accessible to or shared by all members of the community," and "exposed to general view: open."[5] (Capitalization omitted.) Different meanings might

---

[4]In light of our analysis below, there is no need to reach the issue of whether there was sufficient evidence of the requisite possession for the purpose of defacing property while on any "public highway, street, alley, or way, . . . ."

[5]Webster's New Collegiate Dictionary (9th ed. 1986) page 952. Black's Law Dictionary also includes such meanings as "[o]pen to all[,]" "[c]ommon to all or many; general; open to common use." (Black's Law Dict. (4th ed. 1968) p. 1393, capitalization omitted.) It also states that a "public place" is a "place to which the general public has a right to resort; not necessarily a place devoted solely to the uses of the public, but a place which is in point of fact public rather than private, a place visited by many persons and usually accessible to the neighboring public[,]" and "[a]ny place so situated that what passes there can be seen by any considerable number of persons if they happen to look. . . . Also, a place in which the public has an interest as affecting the safety, health, morals, and welfare of the community. A place exposed to the public, and where the public gather together or pass to and fro." (*Id.* at p. 1394.)

affect this case differently.[6] We must look outside the text of section 594.1, subdivision (e)(1), to determine the meaning of the phrase "public place" as used in that subdivision.

The Legislature has used the phrase "public place" elsewhere in the Penal Code, sometimes with apparently conflicting meaning. Thus, section 653.22, subdivision (a), prohibits loitering in any "public place" with intent to commit prostitution. Section 653.20, subdivision (b), which defines the phrase "public place" as used in section 653.22, subdivision (a), states, in relevant part, that " 'Public place' means an area *open to the public*, . . ."[7] (Italics added.) On the other hand, section 311.6, prohibits, inter alia, obscene live conduct "in any *public place* or in any place exposed to public view, *or* in any place *open to the public* or to a segment thereof . . . ." (Italics added.) Thus, under section 653.20, subdivision (b), a "public place" includes an area "open to the public" while, under section 311.6, a "public place" is expressly distinguished from a place "open to the public." Suffice it to say that the phrase "public place" is not used throughout the Penal Code with a clear and uniform legislative meaning from which we may deduce the meaning of that phrase at section 594.1, subdivision (e).

The difficulty of determining the legislative meaning of the phrase "public place" at section 594.1, subdivision (e)(1), from the Legislature's uses of that phrase elsewhere in the Penal Code stems not only from apparently *conflicting* uses of that phrase by the Legislature, but from the fact that, as shown below, the Legislature has used the phrase "public place" in the Penal Code, usually without defining the phrase, and frequently distinguishing it from other terms with which, at least as a matter of common parlance, the phrase "public place" is arguably *synonymous*.

Apart from section 594.1, there are 24 sections of the Penal Code which use the phrase "public place" (or "public places"). Eleven of those sections

---

[6]For example, if "public" is construed to mean "of or relating to a government," the phrase "public place" might be construed to mean a place owned by, or belonging to, the government, in which case Danny H.'s sufficiency claim might be well taken because, arguably, there was insufficient evidence of government ownership in the present case. On the other hand, if "public" is construed to mean "exposed to general view," the phrase "public place" might be construed to mean a place exposed to general view, in which case Danny H.'s claim might be rejected.

[7]Section 653.20, subdivision (b), states, " 'Public place' means an area open to the public, or an alley, plaza, park, driveway, or parking lot, or an automobile, whether moving or not, or a building open to the general public, including one which serves food or drink, or provides entertainment, or the doorways and entrances to a building or dwelling, or the grounds enclosing a building or dwelling."

simply use the phrase without defining it or otherwise shedding light on its meaning.[8]

Of the remaining 13 sections which use the phrase "public place,"[9] only two define the phrase "public place," and one of those two definitions is not very helpful.[10] Nine other sections do not define the phrase, but merely distinguish it from arguably synonymous concepts;[11] from what is arguably a particular type of public place;[12] or from both.[13] Two other sections make other distinctions.[14]

---

[8]Those 11 sections are sections 246.1, subdivision (c); 313.1, subdivisions (c)(1), (2) and (d); 415, subdivision (1); 597.1, subdivision (c); 597f, subdivision (b); 653.22; 840; 5063; 12035, subdivision (b)(2); 12590, subdivision (a); and 13153.

[9]The 13 sections are sections 311.6; 314, subdivision 1; 417, subdivisions (a)(2)(A) and (f); 647, subdivisions (a), (c), and (f); 647c; 647e; 653g; 653k; 653.20; 653.22; 12031, subdivisions (a) and (e); 12040; and 12303.2. In section 647, subdivision (f), the phrase "public place" is simply used without definition.

[10]The two sections are sections 653.20, subdivision (b), and 417, subdivision (f). The definition of "public place" in section 653.20, subdivision (b), is set forth at footnote 7, *ante*. As mentioned, that definition reveals that "public place" includes, inter alia, "an area open to the public[.]" We will consider *infra* the impact, if any, of the fact that a place is private property upon the determination of whether that place is a "public place" within the meaning of section 594.1, subdivision (e)(1). It is sufficient to note at this point that some locations listed in section 653.20, subdivision (b), that is, an alley or park, are not only open to the public, but normally *owned* by the public (or government), but other locations, such as a driveway, parking lot, automobile, doorway or entrance to a building or dwelling, or the grounds enclosing a building or dwelling, may be *privately* owned. Thus, private ownership of a place does not appear to be inconsistent with it being a "public place" for purposes of that subdivision. Section 417, subdivision (a)(2)(A), prohibits the brandishing of specified firearms in a "public place"; subdivision (f), defines that phrase as meaning a "public place" or "public street" in an incorporated city, or a "public street" in an unincorporated area.

[11]We have seen that, in common parlance, a "public place" might be viewed as a place "exposed to general view: open." Nonetheless, section 311.6, prohibits the commission of specified activities regarding obscene live conduct "in any *public place* or in any *place exposed to public view*, or in any *place open to the public* or to a segment thereof, . . ." (Italics added.) Similarly, section 647, subdivision (a), prohibits the commission of specified activities regarding lewd or dissolute conduct "in any *public place* or in any *place open to the public* or *exposed to public view*." (Italics added.) Section 647, subdivision (c), prohibits begging "in any *public place* or in any *place open to the public . . . .*" (Italics added.) Section 647e, which authorizes local governments to enact ordinances prohibiting the possession of opened containers of alcohol beverages on specified premises, and section 653k, which prohibits the possession of switchblade knives, each use the above quoted language found in section 647, subdivision (c).

[12]Section 12031, prohibits the possession of loaded firearms, and section 12040, prohibits the possession of a firearm while wearing a mask; each section prohibits said possession in a "public place or on any public street." Section 653g, prohibits loitering about any "school or public place."

[13]Section 647c, prohibits the obstruction of free movement on "any street, sidewalk, or other public place or on or in any place open to the public[.]"

[14]Section 314, subdivision 1, prohibits indecent exposure "in any public place, or in any *place where there are present other persons to be offended or annoyed thereby*[.]" (Italics

The above further demonstrates that the phrase "public place" is not used in the Penal Code with a clear and uniform legislative meaning from which we may deduce the meaning of that phrase at section 594.1.[15] This fact encourages us to look to the legislative history of section 594.1, subdivision (e)(1), to determine the meaning of the phrase "public place" as it is used there.[16]

Assembly Bill No. 1675 (Assembly Bill 1675) was introduced in the Assembly in March 1981. (Assem. Bill 1675 (1981-1982 Reg. Sess.) as introduced Mar. 26, 1981; 1 Assem. Final Hist. (1981-1982 Reg. Sess.) p. 1126.) In pertinent part, the bill, as introduced, would have added provisions to the Business and Professions Code requiring retailers who sold aerosol paint containers to post signs in their businesses warning that vandalism was a crime, and to label such containers with such a warning.

Assembly Bill 1675 was amended on May 6, 1981, to delete the reference to the Business and Professions Code, and to add proposed Penal Code section 594.1. (Assem. Bill 1675 (1981-1982 Reg. Sess.) as amended May 6, 1981; 1 Assem. Final Hist. (1981-1982 Reg. Sess.) p. 1126.) As amended, the bill, in proposed section 594.1, subdivisions (a) through (c), added new crimes relating to the purchase of aerosol paint containers by minors and retained the sign-posting requirements. In addition, as amended, the bill added proposed subdivisions (d) and (e).

Section 594.1, subdivisions (d) and (e)(1), in effect at the time of the present offenses, originates from subdivisions (d) and (e), as proposed in Assembly Bill 1675 and amended in May 1981. When the latter two subdivisions are read together, it is unclear whether the Legislature intended that a "public place," within the meaning of proposed subdivision (e), be a place over which the government had jurisdiction (for example, a place belonging to, or owned by, the government.)[17]

---

added.) Section 12303.2, prohibits possession of a destructive device in, inter alia, any "public place ordinarily passed by human beings[.]"

[15]Our analysis will make it unnecessary to examine how the phrase "public place" is used outside the Penal Code.

[16]Having complied with our responsibilities under Evidence Code sections 459, subdivision (c), and 455, subdivision (a), we take judicial notice of the below discussed items in that legislative history.

[17]Section 594.1, subdivisions (d) and (e), as proposed in Assembly Bill 1675, amended in May 1981, stated, "(d) It is unlawful for any person to possess an aerosol container of paint for the purpose of defacing property while in any *public facility,* park, playground, swimming pool, beach, or recreational area, *other than a highway, street, alley, or way,* unless he or she has first received valid authorization from the *governmental entity which has jurisdiction* over the public area. [¶] (e) It is unlawful for any person under the age of 18 years to possess an

Nonetheless, other parts of the legislative history of section 594.1, reveal that the Legislature, in enacting that section, was seeking to address widespread problems resulting from the commission of vandalism upon government and privately owned property alike.

An analysis by the Ways and Means Committee prepared for a June 17, 1981 hearing, and pertaining to Assembly Bill 1675 as amended May 6, 1981, comments that the bill "prohibits possession of aerosol paint containers by persons under 18 for the purpose of defacing property while on any *public street or alley*." (Assem. Com. on Ways and Means, Analysis of Assem. Bill 1675 (1981-1982 Reg. Sess.) as amended May 6, 1981, italics added.) The italicized language suggests a limited scope of places affected by the bill.

However, a second comment only two sentences after the first comment states, "The proposed measure responds to the serious problem in some *communities* of graffiti spray painted on walls *and other open spaces*." (Assem. Com. on Ways and Means, Analysis of Assem. Bill 1675 (1981-1982 Reg. Sess.) as amended May 6, 1981, italics added.) This second comment provides evidence that the phrase "public street or alley" in the first comment was merely intended to be a shorthand characterization of the scope of the places affected by the proposed section 594.1, subdivision (e).[18] But that second comment also provides evidence that the scope of the phrase "public place" in proposed section 594.1, subdivision (e), was not intended to be limited merely to a public street or alley, or to places over

aerosol container of paint for the purpose of defacing property while on any *public highway, street, alley, or way, or other public place*, regardless of whether that person is or is not in any automobile, vehicle, or other conveyance." (Assem. Bill 1675 (1981-1982 Reg. Sess.) as amended May 6, 1981; 1 Assem. Final Hist. (1981-1982 Reg. Sess.) p. 1126, italics added.)

The proposed section 594.1, subdivision (d), above implied that a "public facility" was a place over which a "governmental entity . . . has jurisdiction . . . ." Moreover, the terms of proposed subdivision (d), implied that a "highway, street, alley, or way" was a type of "public facility." The phrase "highway, street, alley, or way" in the proposed subdivision (d), was similar to the phase "public highway, street, alley, or way" in proposed subdivision (e). This in turn suggests that the latter phrase also referred to places over which a government entity had jurisdiction. But if so, this further suggests that the phrase "public place" in proposed subdivision (e), also referred to a place over which a government entity had jurisdiction. On the other hand, the phrase "or other public place" in proposed subdivision (e), was not found in the proposed subdivision (d), and, therefore, was not listed in proposed subdivision (d), as one of the places over which the government had jurisdiction. This fact suggests that the Legislature, by adding that phrase to proposed subdivision (e), intended to denote a place over which the government did *not* necessarily have jurisdiction, unlike the "highway, street, alley, or way" specified in proposed subdivision (d).

[18]Indeed, the text of the proposed section 594.1, subdivision (e), itself evidences this, since the places listed in that subdivision included not only a public street or alley, but a "public highway, . . . or way, . . ."

which a government had jurisdiction, but was intended broadly to apply to the "open spaces" in which "communities" were finding graffiti to be a serious problem.

An analysis by the Senate Committee on the Judiciary, and pertaining to Assembly Bill 1675 as amended May 6, 1981, notes that the source of the proposed legislation was the City of Los Angeles, supported by the City of San Diego. The analysis also states, "The purpose of this bill is to attempt to deter defacement of property with spray paint." (Sen. Com. on Judiciary, Analysis of Assem. Bill 1675 (1981-1982 Reg. Sess.) as amended May 6, 1981, p. 2.) Under the caption "Need for bill," the analysis states, "Proponents report that spray paint vandalism is a serious and very visible problem throughout the state, particularly in Southern California." (*Id.* at p. 3.) We note that this last statement referred to the problem of the *visibility* of spray paint vandalism, and neither of the above two quoted statements indicates that the proponents were concerned solely with vandalism to government-owned property, as opposed to private property.

Indeed, the committee file of the Senate Committee on the Judiciary contains a background information form pertaining to Assembly Bill 1675, and the form was prepared for, and submitted to, the committee. The form was apparently filled out by the City of Los Angeles. The form, under the section entitled "Purpose," asks, "What problem or deficiency under existing law does the bill seek to remedy?" The reply states, "Graffiti, in the Los Angeles *area* is still a serious problem. This measure is drafted so that it will not interfere with the legitimate use of paints, but will make it more difficult for individuals to deface *public/private* properties." (Sen. Com. on Judiciary, Background Information Form re: Assem. Bill 1675 (1981-1982 Reg. Sess.) as amended May 6, 1981, p. 1, italics added.) Following additional amendments, Assembly Bill 1675 was, on September 19, 1981, enrolled and sent to the Governor. (Assem. Bill 1675 (1981-1982 Reg. Sess.) as amended Sept. 15, 1981; 1 Assem. Final Hist. (1981-1982 Reg. Sess.) p. 1126.)[19]

---

[19]Assembly Bill 1675 was amended on August 19, 1981. (Assem. Bill 1675 (1981-1982 Reg. Sess.) as amended Aug. 19, 1981; 1 Assem. Final Hist. (1981-1982 Reg. Sess.) p. 1126.) In particular, the proposed section 594.1, subdivisions (d) and (e), were each amended to reflect that the "aerosol container of paint" referred to in each subdivision had to be larger than six ounces (net weight of contents). Subdivision (d), was further amended to contain a rebuttable presumption regarding the requirement that a person intend to deface. (Assem. Bill 1675 (1981-1982 Reg. Sess.) as amended Aug. 19, 1981; 1 Assem. Final Hist. (1981-1982 Reg. Sess.) p. 1126.) An analysis of the Senate Democratic Caucus, and pertaining to Assembly Bill 1675 as amended August 19, 1981, lists the City of San Diego and the "Parks and Recreation Department" as "[p]roponents." (Sen. Democratic Caucus, Analysis of Assem. Bill 1675 (1981-1982 Reg. Sess.) as amended Aug. 19, 1981, p. 1.) The bill was later

Various legislative documents confirm that the enrolled Assembly Bill 1675 was intended to address the widespread impact of graffiti on public and private property alike. A letter from the City Council of the City of Los Angeles to the Governor, dated September 18, 1981, stated, "AB 1675 is an attempt to alleviate the increasing problem of graffiti caused by the use of spray paint cans by minors." The letter later stated, "The ever-increasing problem of graffiti caused by the use of spray paint cans by minors is evident throughout Los Angeles. *Governmental entities and private property owners*, as a consequence, are faced with the expense of eradicating the graffiti and restoring the property damaged by the vandals. The City of Los Angeles' budget in 1978 was over $600,000 to eradicate the graffiti from *public structures and certain private structures* if the graffiti is obnoxious." (City Council of the City of Los Angeles, letter to Governor Brown (1981-1982 Reg. Sess.) Sept. 18, 1981, italics added.)[20] The letter later stated, "The City of Los Angeles feels that AB 1675 is a very necessary step if we are to stem the tide of degradation of our inner city neighborhoods." (Letter to Governor Brown, *supra*, at p. 2.)

A letter dated September 23, 1981, from Assemblyman Richard Alatorre, who sponsored Assembly Bill 1675, to the Governor, stated, "We all know that the blight caused by graffiti is [detrimental] to both the *individual property owner* and the *community which must view it*."[21] (Assemblyman Richard Alatorre, letter to Governor Brown, Sept. 23, 1981, p. 1, italics added.)

The widespread nature of the problem caused by graffiti was reflected in an enrolled bill report from the legal affairs department of the Governor's

---

amended on September 15, 1981. (Assem. Bill 1675 (1981-1982 Reg. Sess.) as amended Sept. 15, 1981; 1 Assem. Final Hist. (1981-1982 Reg. Sess.) p. 1126.) The September 15, 1981 amendments affected the proposed section 594.1, subdivision (d), but not (e). (Language in the former proposed § 594.1, subd. (d), was, by the Sept. 15, 1981 amendment, deleted and replaced.)

[20]The letter continued, "The Los Angeles City Council has sought solutions to the graffiti problem for many years. In 1973, we supported the successful enactment of legislation that made defacement of property a misdemeanor and which also made a minor's parents liable with the minor for *any* damages resulting from such defacement. . . . Finally, in 1978, we supported AB 2530 which now allows a city to use their funds to remove graffiti *from public or privately-owned structures* with proper consent. [¶] At the local level, we are attempting the following programs: our own City Mural Resources Center of the Recreation and Parks Department paints murals on the sides of buildings, both *public and privately owned*. . . . As mentioned earlier, the City is spending *taxpayer's* money to eradicate and we are also pursuing Federal grant programs to help with this cost and for possible public education programs." (City Council of the City of Los Angeles, letter to Governor Brown (1981-1982 Reg. Sess.) Sept. 18, 1981, p. 2, italics added.)

[21]We have inserted the word "detrimental" for what appears in the letter, that is, the word "determined."

Office dated September 24, 1981, and pertaining to Assembly Bill 1675, which states, "Juvenile vandalism with spray paint is a widespread problem causing thousands of dollars in damages each year. However, the most serious use of paint is by youth gangs to establish their territory. These individuals will literally fight and die over their monikers." (Governor's Office, Enrolled Bill Rep. on Assem. Bill 1675 (1981-1982 Reg. Sess.) Sept. 24, 1981.) The report also noted that the provisions of the proposed section 594.1 were "broad."[22] (*Ibid.*) On October 1, 1981, Assembly Bill 1675 was approved by the Governor and, the next day, it was chaptered by the Secretary of State as Statutes 1981, chapter 1125.) (1 Assem. Final Hist. (1981-1982 Reg. Sess.) p. 1126.)

The above legislative analyses, reports, records, and correspondence, part of the legislative history of section 594.1, as enacted in 1981, reveal that Assembly Bill 1675 was intended broadly to address the increasing and widespread problems, shared by the state and Southern California community, of blight, eyesores, and costly property damage to our communities and "open spaces" caused by graffiti sprayed .on government and privately owned property. Section 594.1, as enacted in 1981, was intended as a preliminary crime designed to deter such defacement of property and, thus, the commission of a completed act of spray paint vandalism.

We note that in 1988, section 594.1, subdivision (e), was amended (with other subdivisions) by the deletion of the requirement that the aerosol container of paint be "larger than 6 ounces (net weight of contents)" (§ 594.1, subd. (e), as amended by Stats. 1988, ch. 925, § 1, pp. 2950-2951), effecting a further legislative broadening of the reach of subdivision (e).[23]

In light of our above discussion, and mindful of the innumerable ways in which spray paint vandalism, and thus the preliminary crime proscribed by section 594.1, subdivision (e)(1), can be committed, we believe the legislative history of that subdivision supports a broad construction of the phrase "public place" found therein. Accordingly, we reject the notion that whether a place is a "public place" within the meaning of subdivision (e)(1), is determinable by some bright-line rule, or that a single factor is dispositive,

---

[22]The analyst wrote, "because the provisions [of Assembly Bill 1675] are so broad the bill may well catch innocent minors on their way home from the store. For this reason we recommend that the bill be considered for veto." (Governor's Office, Enrolled Bill Rep. on Assem. Bill 1675 (1981-1982 Reg. Sess.) Sept. 24, 1981.) Of course, the bill became law with those provisions.

[23]In 1993, the existing text of section 594.1, subdivision (e), was redesignated subdivision (e)(1); subdivision (e)(2), was added. (§ 594.1, as amended by Stats. 1993, ch. 604, § 1, pp. 3176-3177, and ch. 605, § 5, pp. 3182-3183.)

and look instead to the totality of the facts and circumstances presented in the record, viewed in light of the usual rules on appeal (*In re Dennis B., supra,* 18 Cal.3d at p. 697), to determine whether there was sufficient evidence satisfying the "public place" element of subdivision (e)(1), in the present case.

There is no dispute that Danny H. was "on any . . . place" for purposes of section 594.1, subdivision (e)(1); the issue is whether that place was a "public place." We conclude that it was and substantial evidence supports that conclusion.[24] The trestle on which he stood was private property but that fact is not controlling; the property did not belong to him and he had no ownership or possessory interest in the property. The trestle was readily accessible; no member of the public wishing to access the trestle was prevented from doing so by any physical barrier. There were several spray cans in the area where Danny H. had been standing, and Officer Phillips's testimony established that, even before Danny H. vandalized the wall, there was graffiti there; these facts provided evidence that one or more persons already had accessed the trestle.

The trestle was unenclosed, visible to the public, and exposed to general view. Thus, an anonymous caller had been able to see Danny H. and his companion while they were on the trestle. Officer Phillips, still in his vehicle and about 75 to 80 feet from Danny H., observed him standing on the raised area of the trestle. The fact that there were walls on either side of the tracks does not alter the fact that the location where Danny H. was standing was substantially an "open space" of a type with which section 594.1, subdivision (e)(1), according to its legislative history, is concerned.

Danny H. obviously wanted his graffiti sprayed at a place where it would be visible. The record permits the inference that he wrote it for gang members to see; a segment of the public, fellow vandals, previously had accessed the location to spray graffiti; and he anticipated that his graffiti would be visible at least to such members of the public. We note that one of the reasons section 594.1, subdivision (e)(1), was enacted was to prevent gang graffiti. The graffiti also would have been visible to any persons being transported on the railroad tracks. Moreover, we note that Foothill was a major boulevard in a largely industrial area. There is no dispute that Danny H. committed vandalism while on the trestle (count one); it seems incongruous, on the above facts, to accept that he committed a completed act of

---

[24]The issue of whether a place is a "public place" for purposes of section 594.1, subdivision (e)(1), is, in the first instance, for the trier of fact to determine based on the totality of the facts and circumstances presented to the trier of fact. We review a sufficiency challenge to that determination using the substantial evidence standard.

vandalism but not, seconds before, a preliminary offense designed to deter that act.

Thus, we conclude that there was sufficient evidence that Danny H. violated section 594.1, subdivision (e)(1), including sufficient evidence that he possessed an aerosol container of paint "while on any . . . public place[]" within the meaning of that subdivision. None of the cases cited by Danny H., or his argument, compels a contrary conclusion.[25]

*2.    There Is No Need to Decide the Section 654 Issue or to Correct the Trial Court's Calculation of the Maximum Theoretical Period of Confinement.*

At disposition, the trial court ordered that a previous order that Danny H. be placed on home on probation would remain in effect. The trial court calculated Danny H.'s maximum theoretical period of confinement, which appeared to include consecutive confinement periods on counts one and two.[26] Danny H. claims the trial court erroneously failed to stay, pursuant to section 654, the term on count two (two months).

There is no need to decide the issue. The section 654 issue is relevant only to the issue of whether the trial court's order calculating Danny H.'s maximum theoretical period of confinement must be corrected. However, here, Danny H. was ordered home on probation in the home of his parents. The court did not order Danny H. removed from the physical custody of his parents. Only when a court orders a minor removed from the physical custody of his parent or guardian is the court required to specify the maximum term the minor can be held in physical confinement. Accordingly, there is no need to decide the section 654 issue or to correct the trial court's order calculating Danny H.'s maximum theoretical period of confinement. (*In re Joseph G.* (1995) 32 Cal.App.4th 1735, 1743-1744 [38 Cal.Rptr.2d 902]; Welf. & Inst. Code, § 725.)

[25]To the extent Danny H. urges (see p. 96, *ante*) that there was insufficient evidence of *public* ownership, section 594.1, subdivision (e)(1), contains the phrase, "on any . . . public place," but it does not contain the phrase, "on any . . . place *owned by the public*, . . ." We reject the suggestion that the Legislature, by enacting the subdivision, was only concerned with protecting the public's or government's surface property rights, intended the court and parties to wrangle over nuances in property law, or intended proof of a violation of the subdivision to depend on the results of a title search.

[26]The court commented that section 654 "arguably" applied to count two but, "presuming [that it did] not," the maximum theoretical period of confinement period had to be increased two months for count two. The maximum theoretical period of confinement was also based on aggregation of terms in another case(s).

## DISPOSITION

The order continuing wardship is affirmed.

Klein, P. J., and Aldrich, J., concurred.

A petition for a rehearing was denied January 6, 2003, and appellant's petition for review by the Supreme Court was denied February 25, 2003. Kennard, J., was of the opinion that the petition should be granted.