[No. B204571. Second Dist., Div. Three. Sept. 29, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
SHANNON MARQUIS STRIDER, Defendant and Appellant.

1394

## Counsel

Willoughby & Associates, W. Anthony Willoughby and Ronnivashti Whitehead for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Scott A. Taryle and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ALDRICH, J.**—Defendant and appellant Shannon Marquis Strider appeals from the judgment entered following a jury trial that resulted in his conviction for possession of a controlled substance, cocaine base, while armed with a loaded firearm. Strider was sentenced to a prison term of two years.

Strider contends the trial court erred by denying his pretrial suppression motion. We agree, and therefore reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Evidence elicited at the hearing on the suppression motion.*[1]

a. *People's evidence.*

Viewing the record in the light most favorable to the trial court's ruling (*People v. Davis* (2005) 36 Cal.4th 510, 528–529 [31 Cal.Rptr.3d 96, 115 P.3d 417]), the following relevant evidence was adduced at the hearing on the suppression motion. On December 5, 2006, at approximately 6:20 p.m., Deputy Jason Bates and his partner, Deputy William Zollo, were on routine patrol in Compton in their police cruiser. Bates observed Strider and another man standing in the fenced front yard near the porch of a single-family house located at 1356 Schinner Street. A wrought iron fence ran along the entire front and east side of the property, connecting with a solid wood fence. There was a gate in the middle of the wrought iron fence. To get to the house via the front door, one had to enter through the gate. A third man had just entered the yard, and was standing next to the gate, which was open.

Bates did not know Strider or the other two men. He was aware that the house was a "known Southside Crip gang hang out" and that the owner of the residence produced rap music "in the back." There had been shootings in the area.

Strider looked directly at the officers, turned to his right, and quickly walked to the front door of the residence. Bates observed Strider's face and the front half of his body. When Strider turned, Bates observed the butt of a

---

[1] Because the sole contention on appeal relates to denial of the suppression motion, we discuss the evidence presented in the hearing on that motion, rather than the evidence presented at trial.

chrome and black handgun protruding from his left rear pants pocket. Bates immediately exited the patrol car and ran after Strider. Strider entered the house and slammed the front security door, which Bates could see through. Bates followed, immediately opened the door, and observed Strider quickly walking towards the kitchen. Bates told Strider to stop. Strider dropped a baggie containing a substance resembling rock cocaine on the kitchen floor, and then complied with Bates's demand. Bates retrieved a loaded, chrome and black, Smith & Wesson .40-caliber, semiautomatic handgun from Strider's pocket. The deputies handcuffed Strider, and Bates recovered the cocaine. Another man was already in the house. In response to Bates's query, the other man stated that he lived at the house, but Strider did not.

### b. *Defense evidence.*

Strider's brother lived at the house and either owned or leased it. Strider did not have to ask for permission to enter and exit the property. The rap studio was located in a detached garage behind the house. A man named Donnie Mitchell, along with his father, rented a room in the house. In addition to the wrought iron fence, a brick-and-wood fence enclosed the west side of the property.

Tyvon Green and Bobby Williams had just entered the yard through the gate when the deputies entered the yard. They were heading toward the music studio. Strider testified that he had not been in the yard, but had been standing in the doorway of the house when he observed the deputies arrive with their lights off. They entered the yard and pointed their guns at Green. Strider closed the door and went to tell "everybody who was in the back" what was going on. Bates then burst through the front door. Strider denied possession of a gun or dropping a baggie containing drugs.

### c. *The trial court's ruling.*

The trial court denied the motion, finding the detention and entry into the home were constitutionally permissible under the totality of the circumstances. The court concluded the yard was a public area because it was exposed and visible to public view, reasoning, "when you're in public, i.e., even though you're on your private property, you're deemed to be in public." The exigent circumstances doctrine justified Bates's entry into the house in pursuit of Strider because Strider's possession of the gun presented a dangerous situation.

### 2. *Procedure.*

Trial was by jury. Strider was convicted of possession of a controlled substance, cocaine base, while armed with a loaded firearm (Health & Saf.

Code, § 11370.1, subd. (a)). Strider was acquitted of carrying a loaded firearm in a public place (Pen. Code, § 12031, subd. (a)(1)).[2] The trial court sentenced Strider to two years in prison. It imposed a restitution fine, a suspended parole restitution fine, a laboratory analysis fee, and a court security assessment. Strider appeals.

## DISCUSSION

*The trial court erred by denying Strider's suppression motion.*

1. *Applicable legal principles.*

When reviewing the denial of a suppression motion, we view the record in the light most favorable to the trial court's ruling, and defer to the trial court's express or implied factual findings if supported by substantial evidence. We exercise our independent judgment to determine whether, on the facts found, the search or seizure was reasonable under the Fourth Amendment. (*People v. Davis, supra*, 36 Cal.4th at pp. 528–529; *People v. Maury* (2003) 30 Cal.4th 342, 384 [133 Cal.Rptr.2d 561, 68 P.3d 1]; *People v. Jenkins* (2000) 22 Cal.4th 900, 969 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Krohn* (2007) 149 Cal.App.4th 1294, 1298 [58 Cal.Rptr.3d 60]; *People v. Knight* (2004) 121 Cal.App.4th 1568, 1572 [18 Cal.Rptr.3d 384].) Challenges to the admissibility of a search or seizure must be evaluated solely under the Fourth Amendment (*People v. Carter* (2005) 36 Cal.4th 1114, 1141 [32 Cal.Rptr.3d 759, 117 P.3d 476]), and evidence obtained as a result of an unreasonable search and seizure is excluded at trial only if exclusion is required by the federal Constitution (*People v. Camacho* (2000) 23 Cal.4th 824, 830 [98 Cal.Rptr.2d 232, 3 P.3d 878]; *People v. Chavez* (2008) 161 Cal.App.4th 1493, 1498 [75 Cal.Rptr.3d 376]).

■ The Fourth Amendment guarantees the right to be free of unreasonable searches and seizures by law enforcement personnel. (U.S. Const., 4th Amend.; *Terry v. Ohio* (1968) 392 U.S. 1, 8–9 [20 L.Ed.2d 889, 88 S.Ct. 1868]; *People v. Thompson* (2006) 38 Cal.4th 811, 817 [43 Cal.Rptr.3d 750, 135 P.3d 3]; *People v. Camacho, supra*, 23 Cal.4th at pp. 829–830.) However, an officer may stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity involving the person is afoot, even if the officer lacks probable cause to arrest. (*United States v. Sokolow* (1989) 490 U.S. 1, 7

---

[2] All further undesignated statutory references are to the Penal Code.

[104 L.Ed.2d 1, 109 S.Ct. 1581]; *Terry v. Ohio, supra,* at p. 30; *In re Manuel G.* (1997) 16 Cal.4th 805, 821 [66 Cal.Rptr.2d 701, 941 P.2d 880]; *In re H.M.* (2008) 167 Cal.App.4th 136, 142 [83 Cal.Rptr.3d 850]; *People v. Krohn, supra,* 149 Cal.App.4th at p. 1298.) " 'Such detentions are permitted, notwithstanding the Fourth Amendment's requirements of probable cause and a search warrant, because they are "limited intrusions" that are "justified by special law enforcement interests." [Citations.]' [Citation.]" *(People v. Durazo* (2004) 124 Cal.App.4th 728, 734 [21 Cal.Rptr.3d 516].)

Under certain circumstances, a law enforcement officer may enter the "curtilage" of a residence without violating the Fourth Amendment.[3] " ' "It is clear that police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house." ' " *(People v. Chavez, supra,* 161 Cal.App.4th at p. 1500; see *People v. Thompson* (1990) 221 Cal.App.3d 923, 942 [270 Cal.Rptr. 863].)

■ " 'It is a "basic principle of Fourth Amendment law" that searches and seizures inside a home without a warrant are presumptively unreasonable.' [Citation.] Indeed, 'the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." ' [Citation.]" *(People v. Thompson, supra,* 38 Cal.4th at p. 817, quoting *Payton v. New York* (1980) 445 U.S. 573, 586, 585 [63 L.Ed.2d 639, 100 S.Ct. 1371].) The presumption of unreasonableness that attaches to a warrantless entry into the home, can, however, " 'be overcome by a showing of one of the few "specifically established and well-delineated exceptions" to the warrant requirement [citation], such as " 'hot pursuit of a fleeing felon, or imminent destruction of evidence, . . . or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling' " [citation]. The United States Supreme Court has indicated that entry into a home based on exigent circumstances requires *probable cause* to believe that the entry is justified by one of these factors such as the imminent destruction of evidence or the need to prevent a suspect's escape.' [Citation.]" *(People v. Thompson, supra,* at pp. 817–818; see *People v. Celis* (2004) 33 Cal.4th 667, 676 [16 Cal.Rptr.3d 85, 93 P.3d 1027].)

---

[3] The "curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' [citation], and therefore has been considered part of the home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *(Oliver v. United States* (1984) 466 U.S. 170, 180 [80 L.Ed.2d 214, 104 S.Ct. 1735].)

■ Where police conduct a search or seizure without a warrant, the prosecution has the burden of showing the officers' actions were justified by an exception to the warrant requirement. (*People v. Camacho, supra,* 23 Cal.4th at p. 830; *People v. Williams* (1999) 20 Cal.4th 119, 136 [83 Cal.Rptr.2d 275, 973 P.2d 52]; *People v. Chavez, supra,* 161 Cal.App.4th at p. 1499; *People v. Knight, supra,* 121 Cal.App.4th at p. 1573.)

### 2. Contentions of the parties.

The People's theory as to why the deputies' actions were constitutionally permissible runs as follows. As discussed in more detail *post,* section 12031 prohibits most persons from carrying a loaded firearm "while in any public place." (§ 12031, subd. (a)(1).) The People contend that the fenced yard where Bates observed Strider constituted a public place for purposes of the statute. Because Bates observed Strider with a gun in his pocket in a public place, the People reason, Bates had a reasonable suspicion supported by articulable facts that Strider was committing a crime, justifying an investigatory detention. Because it was a public place, Bates's entry onto the curtilage of the home did not constitute an unreasonable search. Bates's further foray into the residence was justified under the exigent circumstances doctrine, as Bates was in fresh or hot pursuit of the fleeing Strider.

Strider, by contrast, argues that the fenced yard and porch area was not a "public place" within the meaning of section 12031. Consequently, his possession of the gun in the yard could not have violated section 12031, and Bates lacked reasonable suspicion he was engaged in illegal activity. Therefore, no detention was warranted, the cocaine should have been suppressed, and his conviction must be reversed.

### 3. Because the fenced yard was not a public place within the meaning of section 12031, Strider's suppression motion should have been granted.

It is undisputed that Deputy Bates detained Strider when Bates entered the yard, followed Strider into the house, and ordered Strider to stop. (See *In re Manuel G., supra,* 16 Cal.4th at p. 821; *People v. Garry* (2007) 156 Cal.App.4th 1100, 1106 [67 Cal.Rptr.3d 849].) The only suspected criminal activity suggested by the parties was Strider's carrying of a loaded firearm in a public place in violation of section 12031. Thus, the reasonableness of the detention turns on whether the People established at the suppression hearing

that the fenced front yard was a public place within the meaning of the statute.[4] We conclude it was not.

■ Subject to a variety of exceptions not relevant here, section 12031, subdivision (a)(1) makes it an offense for one to carry "a loaded firearm on his or her person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory."[5] (See *People v. Knight, supra,* 121 Cal.App.4th at p. 1576.) Like several other criminal statutes that use the same or similar terms, section 12031 does not expressly define "public place." (See generally *People v. Tapia* (2005) 129 Cal.App.4th 1153, 1161 [29 Cal.Rptr.3d 158]; *In re Danny H.* (2002) 104 Cal.App.4th 92, 98–100 [128 Cal.Rptr.2d 222].) The phrase "public place" has not been used throughout the Penal Code with a clear and uniform legislative meaning. (*In re Danny H., supra,* at p. 100.)

California courts have made clear that whether a particular location is a "public place" or "public area" depends on the totality of the facts of the individual case. (*People v. Cruz* (2008) 44 Cal.4th 636, 674 [80 Cal.Rptr.3d 126, 187 P.3d 970] [construing § 647, subd. (f), which prohibits public intoxication]; *In re Danny H., supra,* 104 Cal.App.4th at pp. 104–105 [construing § 594.1, subd. (e)(1)]; *People v. White* (1991) 227 Cal.App.3d 886, 892 [278 Cal.Rptr. 48] [construing § 647, subd. (f)].) "When construing statutes forbidding certain behavior in a 'public place' or 'public area,' California courts have routinely held that privately-owned property can constitute a public place." (*People v. Tapia, supra,* 129 Cal.App.4th at p. 1161; see *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 317–319 [86 Cal.Rptr.3d 674]; *People v. Jimenez* (1995) 33 Cal.App.4th 54, 59–60 [39 Cal.Rptr.2d 12].) "The term 'public place' generally means 'a location readily accessible to all those who wish to go there . . . .' [Citation.] The key consideration is whether a member of the public can access the place 'without challenge.' [Citation.]" (*People v. Krohn, supra,* 149 Cal.App.4th at p. 1298.)

---

[4] Even if Bates had a reasonable suspicion that Strider had a loaded firearm in a public area, justifying an investigatory detention, it is not certain that Bates's warrantless, uninvited entry into the home was constitutionally permissible on the theory that Bates was in hot pursuit of a fleeing felon or that exigent circumstances existed. However, because we conclude that Bates lacked reasonable suspicion for the investigatory detention in the first instance, we need not reach these issues.

[5] The statute contains numerous exceptions for, inter alia, peace officers, military personnel, and other persons, under specified circumstances. None of those exceptions are relevant here. (See *People v. Flores* (2008) 169 Cal.App.4th 568, 576 [86 Cal.Rptr.3d 804].)

For example, in *In re Zorn* (1963) 59 Cal.2d 650 [30 Cal.Rptr. 811, 381 P.2d 635], our Supreme Court considered whether a barbershop was a "public place" within the meaning of a Los Angeles municipal ordinance that prohibited appearing in a public place in a state of intoxication. (*Id.* at pp. 651–652.) *Zorn* found that it was. " '[P]ublic' has been defined as ' "Common to all or many; general; open to common use," ' and ' "Open to common, or general use, participation, enjoyment, etc.; as, a *public* place, tax, or meeting." ' [Citations.]" (*Id.* at p. 652.) A barbershop therefore qualified as a public place. (*Ibid.*)

Places of business and parking lots on private property, open to the general public, have consistently been held to be public places. In *People v. Vega* (1971) 18 Cal.App.3d 954, 958 [96 Cal.Rptr. 391], the court concluded a parking lot was a public place within the meaning of the statute at issue here, section 12031. The defendant was arrested with a loaded gun in a market parking lot while conducting a drug deal. The court quickly disposed of his contention that the area was not a public place, reasoning, "[t]he parking lot of a market, being accessible to members of the public having business with the market, is a public place for purposes of section 12031 of the Penal Code." (*People v. Vega, supra,* at p. 958; see also *People v. Green* (1971) 15 Cal.App.3d 766, 771 [93 Cal.Rptr. 433] [hospital parking lot, accessible to members of public having business with the hospital, was a public place]; *People v. Belanger* (1966) 243 Cal.App.2d 654, 657–659 [52 Cal.Rptr. 660] [for purposes of § 647, subd. (f), public streets, highways, and sidewalks were obviously public places].)

In *In re Danny H., supra,* 104 Cal.App.4th at pages 104 to 105, we concluded that a railroad trestle was a public place for purposes of section 594.1, subdivision (e)(1), which prohibits a person under 18 from possessing an aerosol paint container for purposes of defacing property while at any public place. The trestle was on private property, but did not belong to the defendant, and he had no ownership or possessory interest in it. (*In re Danny H., supra,* at p. 105.) Moreover, the trestle was "readily accessible; no member of the public wishing to access the trestle was prevented from doing so by any physical barrier." (*Ibid.*) It was "unenclosed, visible to the public, and exposed to general view." (*Ibid.*)

It has been held that a "public place includes the area outside a home in which a stranger is able to walk without challenge." (*People v. Cruz, supra,* 44 Cal.4th at p. 674.) For example, in *People v. Olson* (1971) 18 Cal.App.3d 592 [96 Cal.Rptr. 132], an intoxicated woman rang the doorbell at a residence,

was allowed in by the homeowner, who was a stranger to her, and fell asleep at the homeowner's kitchen table. The homeowner summoned police in an effort to obtain help for the defendant. Police arrested the woman for being intoxicated in a public place (§ 647, subd. (f)). (*People v. Olson, supra*, at pp. 594–595.) *Olson* concluded that the area outside the house, including the driveway, lawn, and porch, "was a public place within the meaning of section 647, subdivision (f). . . . Inasmuch as defendant, a complete stranger to [the homeowner], was able to walk through the outside area of her home to the front door without challenge, it can hardly be denied that the area is open to 'common' or 'general use.' " (*People v. Olson, supra*, at p. 598.)

In *People v. Jimenez, supra*, 33 Cal.App.4th 54, the defendant sold narcotics in a residential driveway. His sentence was enhanced pursuant to Health and Safety Code section 11353.6, which applied, inter alia, to the sale of controlled substances within "public areas" located within 1,000 feet of schools. (*People v. Jimenez, supra*, at pp. 57–58.) The court concluded the unfenced residential driveway was a public area within the meaning of Health and Safety Code section 11353.6. (*People v. Jimenez, supra*, at p. 60.) It reasoned that " 'public area' " was not synonymous with " 'public property.' " (*Id.* at p. 59.) Instead, for purposes of Health and Safety Code section 11353.6, " 'public area' " encompassed not only publicly owned locations "such as streets, sidewalks and bus stops" but also "those portions of private property which are readily accessible to the public." (*People v. Jimenez, supra*, at p. 60.)

Similarly, *People v. Yarbrough, supra*, 169 Cal.App.4th 303, held that in a prosecution for violation of section 12031, it was not error to instruct the jury that the area in front of a home, including a private driveway, was a public place if it was reasonably accessible to the public without a barrier. (169 Cal.App.4th at pp. 315, 319.) There, the defendant was observed by police with a group of men gathered on a driveway, next to an abandoned vehicle, in front of an unoccupied, unfenced house with a "for sale" sign on the front lawn. (*Id.* at pp. 307–308, 319.) The residence did not belong to any of them. The homeowner was not present, and had not given permission for the group to congregate there. The driveway was "unenclosed, visible to the public, exposed to general view, and had no other physical barrier to access." (*Id.* at p. 319.)

In *People v. Perez* (1976) 64 Cal.App.3d 297, 301 [134 Cal.Rptr. 338], we held that an apartment hallway was a public place for purposes of section 647, subdivision (f) because it was readily accessible to all who wished to go

there. "There were no locked gates or doors to keep the public from entering. Hallways and stairways of multiple dwellings are open to delivery men, service men, solicitors, visitors and other strangers, whether those hallways are interior or exterior to the buildings . . . . In other words, a 'public place' within the meaning of [section 647, subdivision (f)] is a location readily accessible to all those who wish to go there rather than a place which the general public frequents." (*People v. Perez, supra*, at p. 301, fn. omitted.)

Conversely, "a location *guarded by a fence* or locked door is not readily accessible to the public, and is not a public place." (*People v. Krohn, supra*, 149 Cal.App.4th at p. 1298, italics added.) For example, in *People v. White, supra*, 227 Cal.App.3d 886, the court concluded a fenced yard did not constitute a public place for purposes of the public intoxication statute, section 647, subdivision (f). The intoxicated defendant was standing on the front porch of his residence. The yard was surrounded by a three and one-half-foot-high fence, which included an unlocked gate. When a police officer asked to speak to him, the defendant released three dogs into the yard, and told the officer to come into the yard to speak to him. (*People v. White, supra*, at pp. 889–890.) *White* concluded the yard was not a public place, reasoning, "Appellant herein was located in his own front yard surrounded by a three-and-a-half-foot-high fence with a gate which was unlocked at the time. The gate was not standing open. Deputy Moore opened it. Appellant released three dogs into the yard, which from all appearances acted as an effective if unintentional deterrent to the arresting officer. This fenced yard cannot be characterized as a 'public place,' i.e., 'common to all or many; general; open to common use.' [Citation.] In contrast to [*People v. Olson, supra*, 18 Cal.App.3d 592], the fence, gate and dogs all provided challenge to public access. Appellant may have been found intoxicated in a place exposed to public view but that, in and of itself, is not a violation of section 647, subdivision (f)." (*People v. White, supra*, at pp. 892–893, fn. omitted.)

Similarly, in *People v. Krohn, supra*, 149 Cal.App.4th 1294, the court concluded an apartment stairway and courtyard were not public places for purposes of a local ordinance. There, the officer saw the defendant carrying a bag of trash and a beer can down an external flight of stairs connecting a second-story breezeway to the ground floor courtyard. The officer detained him on suspicion he was illegally drinking alcohol in a public place. (*Id.* at p. 1296.) The two-story apartment complex was surrounded by a tall, imposing metal fence with spikes on top and automatically locking gates. The gates were often propped open. The court explained: "The fences and gates certainly 'challenge' the public's access to the courtyard. [Citation.] This is

true even if the front gate is periodically propped open. [Citations.] The courtyard is not readily accessible to the public." (*Id.* at p. 1299; see also *In re R.K.* (2008) 160 Cal.App.4th 1615, 1621–1622 [73 Cal.Rptr.3d 575] [doorless woodshed, located 10 to 15 feet from house, in unfenced yard, was not a public place, even though an officer was able to walk to the shed unimpeded].)

Applying the foregoing authorities to the instant matter, we conclude that the porch and area inside the fenced yard was not a public place within the meaning of section 12031. The only evidence in the record indicates that Strider's brother resided at, and owned or leased, the house, and Strider was lawfully on the premises. The front yard was completely surrounded by a wrought iron fence on two sides, and a wood or wood-and-brick fence on the other two sides. Photographs of the residence suggest the fences were approximately four and one-half to five feet high. The only access to the front door was through the single gate in the fence. As noted *ante*, the "key consideration is whether a member of the public can access the place 'without challenge.' [Citation.]" (*People v. Krohn, supra*, 149 Cal.App.4th at p. 1298.) Here, there was a considerable challenge: a high metal fence. Although it is possible to easily see into the yard through the fence slats, the fence is neither flimsy nor purely decorative; its appearance suggests its purpose is to block entry into the yard and act as a barrier to common or general use. Indeed, the dictionary defines fence as, inter alia, "*a barrier intended to prevent escape or intrusion* or to mark a boundary." (Webster's 3d New Internat. Dict. (1976) p. 837, col. 2, italics added.) Given the existence of the fence, the People's arguments that the yard was "not restricted in any fashion" and was "unsecured" simply ignore the evidence credited by the trial court.

■ The People urge that the front yard was a public place because it could be easily viewed through the fence. While we agree that visibility is a factor figuring into the calculus (see *In re Danny H., supra*, 104 Cal.App.4th at p. 105), it is not dispositive here, where the fence acted as a barrier. (See *People v. White, supra*, 227 Cal.App.3d at pp. 892–893 [fact that appellant was found in fenced yard exposed to public view did not establish violation of public intoxication statute].) That a fenced, secured area is visible to the public cannot, in our view, serve as the touchstone to establish it was a public place. The interior of a home may be easily visible through open curtains or large windows, but clearly it would not qualify as a public place within the meaning of the statute.

The People's citations to *People v. Edelbacher* (1989) 47 Cal.3d 983 [254 Cal.Rptr. 586, 766 P.2d 1], *People v. Zichwic* (2001) 94 Cal.App.4th 944 [114 Cal.Rptr.2d 733], *U.S. v. Garcia* (9th Cir. 1993) 997 F.2d 1273, 1279–1280,

and *U.S. v. Magana* (9th Cir. 1975) 512 F.2d 1169, 1171, do not compel a contrary conclusion. A key issue in those cases was whether officers were lawfully at the place from which they observed criminal activity. They teach that "it is not a Fourth Amendment search for a police officer to see an item that is exposed to public view, though the item is within the curtilage of a residence." (*People v. Zichwic, supra*, at p. 954.) In line with the unremarkable proposition that an officer's observations with the naked eye, from a vantage point open to the public, is ordinarily not regarded as a search within the meaning of the Fourth Amendment (*People v. Edelbacher, supra*, at p. 1015; *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 634 [108 Cal.Rptr. 585, 511 P.2d 33]), the cited cases found no Fourth Amendment violation when officers entered the curtilage of various residences and made plain view observations. (See *U.S. v. Garcia, supra*, at pp. 1279–1280 [officers went to back door of an apartment, believing it was the principal entrance to the dwelling, spoke to the defendant through a screen door, and observed he was holding a bundle of cocaine; because the door was readily accessible to the general public, no search occurred and the 4th Amend. was not implicated]; *U.S. v. Magana, supra*, at pp. 1170–1171 [officers who were providing security for undercover drug buy drove into residential driveway and observed the defendant, who was in his open garage, throw narcotics; officers' act of entering the driveway was not unreasonable]; *People v. Zichwic, supra*, at pp. 953–957 [pursuant to a parole search condition, officers installed an electronic tracking device on defendant's truck, which was parked in an open driveway in an apartment complex; installation of the device was not a search]; *People v. Edelbacher, supra*, at p. 1015 [officer saw shoe prints in the front yard, driveway, and porch area of defendant's parents' home; his observation did not constitute a search because he took the normal route used by visitors approaching the front of the residence, and "there [was] no indication of solid fencing or visible efforts to establish a zone of privacy"].)

Here, in contrast to these cases, the key issue is not whether Deputy Bates's observation of the gun through the fence constituted a search. Clearly, it did not; Strider and the gun were in plain view through the fence, and Bates was on a public street, at a lawful vantage point. (See, e.g., *People v. Chavez, supra*, 161 Cal.App.4th at p. 1501.) That fact, however, does not justify the detention. The detention was lawful only if Bates had a reasonable, articulable suspicion Strider was involved in criminal activity. (*Illinois v. Wardlow* (2000) 528 U.S. 119, 123 [145 L.Ed.2d 570, 120 S.Ct. 673]; *In re Manuel G., supra*, 16 Cal.4th at p. 821.) Bates could not have reasonably suspected Strider unlawfully had a gun on his person while in a public place unless the yard was a public place. Thus, jurisprudence related to the plain view doctrine and the legality of officers' entry onto the curtilage is inapposite.

Next, the People urge that the deputies entered "through an open gate through which Williams and Green were also entering." They posit that the yard furnished the normal access to the house. There was no evidence the gate was usually locked, and there was no impediment in addition to the gate, such as the three pet dogs in *White*. The People point out that, "[h]ad a salesperson, delivery person, or appellant's friends or coworkers arrived outside the house that day, they would have taken the same route followed by Deputy Bates."

We are unpersuaded. The fact the gate was not locked at the time the deputies entered does not show the area was public. (See *People v. White, supra*, 227 Cal.App.3d at p. 892 [yard was not a public place despite the fact the gate was unlocked]; *People v. Krohn, supra*, 149 Cal.App.4th at p. 1299 [fence and gates in apartment complex challenged public access, even though gate was periodically propped open].) The People had the burden to justify the detention, and they presented no evidence that the gate was typically open or unlocked. That access to the front door was through the yard is not significant where, as here, the yard is fully enclosed by a fence. As to the argument that there were no additional challenges to access in addition to the fence, such as dogs, we believe that under the circumstances presented here, it is unreasonable to consider the fenced yard to be "public" unless the homeowner has fortified it with multiple security mechanisms.

Next, the People urge that, because two persons in addition to the primary resident rented a room in the house, the yard was equivalent to the apartment hallway we found was a public place in *People v. Perez, supra*, 64 Cal.App.3d 297. The two locales are not comparable. The apartment complex in *Perez* was a multiunit, multistory dwelling, and "[t]here were no locked gates or doors to keep the public from entering." (*Id.* at p. 301.) Even the common area of a multiunit apartment complex has been held to be nonpublic where the complex is gated and fenced. (*People v. Krohn, supra*, 149 Cal.App.4th at pp. 1298–1299.)

The People further contend that the area must be considered public because it was a known Crip "hangout." From this fact they reason that "[t]he property, especially the front yard and porch, would thus qualify as a 'public place,' because it was open to common or general use and the public could enter without challenge." We agree that a fenced yard or residential area might, under certain unusual circumstances, be considered a public area, for example where the area is used indiscriminately by numerous drug users and sellers for their activities. Here, however, there was no evidence that the house or yard was frequented by anyone other than persons who had been invited there, nor was there evidence of a large number of visitors, either at the time of the arrest, or at any other time. Further, given the documented

territorial nature of criminal street gangs, the fact that gang members frequented the locale does not support a conclusion that the "public could enter without challenge," as the People suggest.

Nor can we conclude, on the record before us, that the existence of the music studio in the detached garage behind the house made the yard a public place. There was little evidence presented at the hearing regarding the recording studio, and the trial court did not premise its finding that the area was public on its existence. The evidence did show that the studio was being accessed by Williams and Green via the front yard when the deputies arrived. Further, Deputy Bates stated: "I wouldn't say it was an actual successful business running out of that location," although it was "[a] larger business." Strider testified that he was going to tell "everybody who was in the back" what was going on just before Bates burst through the front door, implying that there were persons in the studio at the time. Photographs of the residence suggest that the front yard was completely enclosed and that to access the studio through the yard, a visitor would have to go through the house; the record suggests, but does not make clear, that there was other access to the studio from behind the house. Given the paucity of evidence demonstrating that the music studio typically hosted a significant number of people or was open to the general public, or that the yard was the normal access route to the studio, its existence does not show the fenced front yard was a public place.

Finally, the People argue that interpreting "public place" to include the fenced front yard would effectuate the public policy restricting possession of firearms in public. They point to subdivision (a)(5)(A) of section 12031, which provides that an officer may arrest a suspect without a warrant even when "the person arrested has violated this section, although not in the officer's presence" and "[w]henever the officer has reasonable cause to believe that the person to be arrested has violated this section, whether or not this section has, in fact, been violated." (§ 12031, subd. (a)(5)(A)(i), (ii).) The first paragraph is largely irrelevant, and the second is inapplicable. Because the yard was fenced and not a public area, Deputy Bates could not have had reasonable cause to believe Strider had violated the statute.

Because Deputy Bates lacked a reasonable suspicion that criminal activity involving Strider was afoot, the detention was unreasonable under the Fourth Amendment, as was his warrantless, uninvited entry into the house. Accordingly, because the drugs were only visible to Bates after he entered the house and should have been suppressed, Strider's conviction for possession of a controlled substance while armed with a firearm must be reversed. (See *People v. Krohn, supra,* 149 Cal.App.4th at p. 1299.)

## DISPOSITION

The judgment is reversed.

Klein, P. J., and Kitching, J., concurred.