Filed 1/7/21  In re J.A. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.A., a Person Coming Under the Juvenile Court Laws | |
| ———————————————— | A159453 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | |
| v. | (Solano County |
| J.A., | Super. Ct. No. J44745) |
| Defendant and Appellant. | |

In this juvenile delinquency proceeding under Welfare and Institutions Code section 602, the minor J.A. challenges the juvenile court's jurisdictional and dispositional orders, contending the evidence did not support the sustained allegation of carrying a loaded firearm in a public place (Pen. Code, § 25850), the court miscalculated his maximum term of confinement (Welf. & Inst. Code, § 726), and the court abused its discretion in imposing gang conditions on his probation.  We will order a modification of his maximum term of confinement and affirm the orders in all other respects.

1

## I. FACTS AND PROCEDURAL HISTORY

A juvenile wardship petition filed under Welfare and Institutions Code section 602, subdivision (a), charged appellant with assault with a firearm (Pen. Code, § 245, subd. (a)(2)), carrying a loaded firearm in public (§ 25850, subds. (a) & (c)(6)), and being a minor in possession of a firearm (§ 29610).[1] The petition further alleged a firearm enhancement and a great bodily injury enhancement as to the assault (§ 12022.5, subd. (a); § 12022.7).

### A. Contested Jurisdictional Hearing

At a contested jurisdictional hearing in Sacramento County Juvenile Court on October 7-9, 2019, the evidence included the following.

In May 2019, victim Jonah Munger-Bounds and Griffin Campbell were roommates at an apartment on Summersdale Drive in Sacramento. On the afternoon of May 28, 2019, Munger-Bounds received a SnapChat message from a friend, M.R., regarding a party Munger-Bounds had thrown the day before. M.R. was upset that Munger-Bounds had invited a person to the party with whom M.R. "had problems." They argued over SnapChat for three hours; M.R. ultimately told Munger-Bounds that he was coming to Munger-Bounds' apartment, uninvited, and threatened to shoot him.

Munger-Bounds and Campbell left their apartment and spoke with their neighbors, Robert Haberern and Adrianna Heltman, on the neighbor's front porch in the same apartment complex. They were approached by M.R. and appellant, whom Munger-Bounds had met a few times before. Heltman testified that M.R. and appellant entered the apartment complex through the gate behind her apartment. Haberern had seen them walking up the street.

---

[1]     Except where otherwise indicated, all statutory references hereafter are to the Penal Code.

2

Immediately, M.R. began to fight Munger-Bounds. After several minutes, Munger-Bounds placed M.R. in a "rear naked choke," at which point Campbell pulled him off of M.R. Munger-Bounds thought the fight was over and he had won; Campbell believed the two looked ready to resume the fight and stood between them.

"[I]n a split second," appellant pulled a .38-caliber special revolver from his jacket and shot Munger-Bounds in the torso. Appellant and M.R. fled the scene. Campbell helped Munger-Bounds back to their apartment and called 911.

Sacramento Police Officer Colby Anderson arrived at the scene and observed the gunshot wound to Munger-Bounds's lower left abdomen. Munger-Bounds identified appellant and M.R. as being involved in the shooting.

Officer Anderson provided appellant's and M.R.'s names to Detective Michael Loscher, who was assigned to investigate the shooting. A Vacaville police officer informed the detective that M.R. was being treated at a Vacaville hospital. Detective Loscher and another detective met M.R. at the hospital and confirmed his involvement in the shooting. The detectives contacted appellant's parents, who brought him to the police station around 3:00 a.m. on May 29, 2019.

At the jurisdictional hearing, Munger-Bounds identified appellant as the person who shot him. Campbell was "very confident" that appellant, not M.R., had fired the gun. Haberern also saw appellant fire the gun. Heltman thought M.R. had fired the gun, but she was not "fully paying attention."

The Sacramento County Juvenile Court found true all the allegations and enhancements. The court transferred the matter to Solano County for disposition and further proceedings.

3

B.  <u>Contested Dispositional Hearing</u>

On January 24, 2020, the Solano County Juvenile Court adjudged appellant a ward of the court, granted him probation, and committed him to the custody of the probation department.  The court calculated his maximum term of confinement at 21 years 120 days, and imposed terms and conditions on his probation, including gang conditions discussed *post*.  This appeal followed.[2]

## II.  <u>DISCUSSION</u>

A.  <u>Substantial Evidence of Section 25850 Violation</u>

As mentioned, the court found true the allegation that appellant violated section 25850, subdivision (a), which provides: "A person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while *in any public place or on any public street* in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory."  (§ 25850, subd. (a), Italics added;  see CALCRIM No. 2530.)

Appellant contends there was insufficient evidence that he was carrying the loaded firearm in a public place or on a public street.  We review for substantial evidence.  (*In re Sylvester C*. (2006) 137 Cal.App.4th 601, 605; *In re Ryan N*. (2001) 92 Cal.App.4th 1359, 1371.)

For purposes of section 25850, whether a firearm was carried in a public place turns not on whether the location was public property or private

---

[2]     The notice of appeal states that the appeal is from "the sustaining of the petition following contested jurisdictional hearing on October 9, 2019; and the gang terms imposed as part of the disposition on January 24, 2020."  We construe the notice of appeal broadly to include the unlawful calculation of the maximum term of confinement, which was included as part of the disposition order and which both parties agree must be modified to comply with the law.

property, but on whether the location was "reasonably accessible" to the public, even if privately owned. (See, e.g., *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 318–319 [private driveway was a public place for purposes of carrying a loaded firearm in public under § 12031, subd. (a), because the driveway was reasonably accessible to the public, without obstacles to access]; *People v. Jimenez* (1995) 33 Cal.App.4th 54, 59–60 [residential driveway was a "public area" for purposes of Health & Saf. Code, § 11353.6]; *People v. Olson* (1971) 18 Cal.App.3d 592, 598 [driveway, lawn, and front porch of private home was a public place for purposes of § 647, subd. (f), where the defendant, a stranger, was able to walk through the area to the front door without challenge]; *People v. Vega* (1971) 18 Cal.App.3d 954, 958 [privately-owned market parking lot was accessible to the public and thus a public place for purposes of § 12031].)

In *People v. Perez* (1976) 64 Cal.App.3d 297 (*Perez*), the court held that an apartment hallway was a public place for purposes of public intoxication under section 647, subdivision (f), where there were "no locked gates or doors to keep the public from entering" and the hallways and stairways—both interior and exterior—were "open to delivery men, service men, solicitors, visitors and other strangers." (*Id*. at p. 301.) A "public place," the court explained, "is a location readily accessible to all those who wish to go there rather than a place which the general public frequents." (*Ibid*.)

Here too, a reasonable inference from the evidence is that the apartment complex was "readily accessible to all those who wish[ed] to go there." (*Perez, supra*, 64 Cal.App.3d at p. 301.) According to Heltman, appellant and M.R. "came up" the street and "came in the gate" behind her apartment. There was no indication that the gate was locked or their access was in any way challenged.

5

Appellant's reliance on *People v. Strider* (2009) 177 Cal.App.4th 1393 (*Strider*) is misplaced.  In *Strider*, police officers observed the defendant standing in a fenced front yard near the porch of a single-family residence. (*Id*. at p. 1396.)  When the officers noticed a gun in the defendant's back pocket, one of the officers ran toward him through a gate in the fence.  (*Id*. at pp. 1396–1397.)  The defendant retreated into the house, and the officer pursued him inside.  There, the defendant dropped a baggie of cocaine, complied with the officer's demand to stop, and was found to be carrying a gun in his pocket.  (*Ibid*.)  To justify the warrantless detention and search, the People suggested that the officers had suspected the defendant was carrying a loaded firearm in the front yard, which the People claimed was a public place.  (*Id*. at p. 1400.)

The court of appeal rejected the People's theory, asserting that " 'a location *guarded by a fence* or locked door is not readily accessible to the public, and is not a public place.' " (*Strider, supra,* 177 Cal.App.4th at p. 1404, italics in original.)  The porch and area inside the fenced yard was not a public place for purposes of section 12031, the court concluded, because the area was completely surrounded by a fence approximately five feet high, the only access was through a single gate, the high metal fence posed a "considerable challenge," and "its appearance suggests its purpose is to block entry into the yard and act as a barrier to common or general use."  (*Id*. at p. 1405.)  Further, the court noted, "[t]he fact the gate was not locked at the time the deputies entered does not show the area was public," and the People had presented no evidence that the gate was typically open or unlocked.  (*Id*. at p. 1407.)  The court found the single-family residence "not comparable" to the multiunit, multistory apartment complex in *Perez*, noting also that a common area of a multiunit apartment complex had been held nonpublic in

6

*People v. Krohn* (2007) 149 Cal.App.4th 1294 (*Krohn*), where the complex was gated and fenced. (*Strider*, at p. 1407; see *Krohn*, at p. 1299 [courtyard of apartment complex was not a public place where the front entryway was "guarded by an imposing metal fence and an automatically locking gate," "[n]othing in the record suggest[s] that the gate was open when the officer detained [the] defendant," and the "driveway to the private parking area behind the courtyard [was] guarded by an electric gate, which automatically close[d] and lock[ed] behind cars" and was closed when police arrived].)

 *Strider* and *Krohn* are distinguishable. Unlike the fenced-in front yard of the single-family residence in *Strider*, the location here was a multi-unit apartment complex with multiple residents. Unlike the evidence in *Strider* of a high metal fence imposing a "considerable challenge," and the evidence in *Krohn* of an imposing metal fence and automatically-locking gate, there is no evidence in this case that any fence posed a challenge to entry or that the gate through which appellant travelled was locked, locked automatically, or limited anyone's access.

 From the record on appeal, therefore, it was reasonable to conclude that the victim's apartment complex was readily accessible to members of the public—including appellant and M.R. as they walked from the street to the area where appellant shot Munger-Bounds in front of his neighbors. Sufficient evidence supported the sustained allegations.[3]

---

[3]  In addition, a conviction may be obtained under section 25850, subdivision (a) where the loaded firearm was carried on a "public street." Here, the evidence was that appellant and M.R. entered the apartment complex from a "street" where a white van was located. It is reasonable to infer that appellant was carrying the loaded firearm on a public street just before he walked into the apartment complex. Reversal is not compelled " 'unless it clearly appears that upon no hypothesis whatsoever is there sufficient substantial evidence to support the conclusion reached by the court below.' " (*In re Man J*. (1983) 149 Cal.App.3d 475, 482.

B.  Section 654 and Maximum Term of Confinement

The juvenile court calculated appellant's maximum term of confinement under Welfare and Institutions Code section 726 to be 21 years 120 days, based on 17 years for the assault with a firearm (count 1), three years eight months for carrying a loaded firearm in public (count 2), and eight months for being a minor in possession of a firearm (count 3).

Appellant argues that the court erred in imposing punishment on both count 2 and count 3, because he did not have independent criminal objectives as to those offenses.[4]  He adds that the sentence on count two should have been eight months (one-third the midterm) rather than three years eight months, and the maximum term of confinement was erroneously stated as well.  Respondent agrees.  We address section 654 first, and then put it in proper context.

1.  Section 654

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)

"Section 654 prohibits multiple punishment for a single physical act that violates different provisions of law." (*People v. Jones* (2012) 54 Cal.4th 350, 358.)  "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one

_____

[4]     Appellant's trial attorney did not object on the ground of section 654, but a defendant may raise a section 654 issue on appeal even if no objection was made in the trial court. (*People v. Hester* (2000) 22 Cal.4th 290, 295.)

8

objective, the defendant may be punished for any one of such offenses but not for more than one." (*People v. Neal* (1960) 55 Cal.2d 11, 19.)

As applied here, "the single possession or carrying of a single firearm on a single occasion may be punished only once under section 654." (*Jones, supra*, 54 Cal.4th at p. 357.) Appellant's offenses for carrying a loaded firearm (count 2) and being a minor in possession of a firearm (count 3) were based on his single act of carrying the .38-caliber revolver used to shoot Munger-Bounds.

Respondent agrees that the court should have "stayed" the "sentence" on count 3. More accurately, the court should not have included a consecutive term on count three in calculating appellant's maximum term of confinement—as we discuss next.

### 2. Maximum Confinement Time

When a minor is removed from the parent's physical custody, "the order shall specify that the minor may not be held in physical confinement for a period in excess of the maximum term of imprisonment which could be imposed upon an adult convicted of the offense or offenses which brought or continued the minor under the jurisdiction of the juvenile court." (Welf. & Inst. Code, § 726, subd. (d)(1); see Welf. & Inst. Code, § 731, subd. (c).) The "maximum term of imprisonment" means "the longest of the three periods set forth in paragraph (3) of subdivision (a) of Section 1170 of the Penal Code, but without the need to follow the provisions of subdivision (b) of Section 1170 of the Penal Code"—that is, a felony is deemed to carry the upper term. (Welf. & Inst. Code, § 726, subd. (d)(1).)

Enhancements, as well as running terms consecutively, generally increase the maximum term of confinement as they would increase an aggregate sentence in adult court. (*In re George M.* (1993) 14 Cal.App.4th

9

376, 381–382; *In re Prentiss C.* (1993) 14 Cal.App.4th 1484, 1488; *In re Jesse F.* (1982) 137 Cal.App.3d 164, 168–170; see § 1170.1.) Thus, the maximum confinement term under Welfare and Institutions Code section 726 is calculated by adding the upper term for the principal offense (plus enhancements) and one-third of the middle term for each of the remaining subordinate felonies or misdemeanors. (*In re David H.* (2003) 106 Cal.App.4th 1131, 1133–1134.) However, the maximum term of confinement cannot be extended by any consecutive term subject to section 654. (*In re Michael B.* (1980) 28 Cal.3d 548, 556 fn. 3.)[5]

Appellant's principal offense was assault with a firearm (count 1), which has a maximum prison term of four years. (§ 245, subd. (a).) The firearm enhancement (§ 12022.5, subd. (a)) adds a maximum term of 10 years, and the great bodily injury enhancement (§ 12022.7) adds a term of three years, rendering a total maximum confinement of 17 years as to count 1. Carrying a loaded firearm in public (count 2) and being a minor in possession of a firearm (count 3) each carry a midterm of two years. (§§ 25850, subd. (c)(6), 29610, 1170, subd. (h).) Because punishment for carrying a loaded firearm in public was a subordinate term, it should have been calculated at one-third the midterm pursuant to section 1170.1, which results in a term on count 2 of eight months, rather than three years eight months as calculated by the probation department and trial court. As

---

[5] Unlike adult sentencing, section 654 has no effect if the term is imposed concurrently, because the term does not increase the theoretical maximum length of the juvenile's confinement. (*In re Robert W.* (1991) 228 Cal.App.3d 32, 34; cf. *Jones, supra*, 54 Cal.4th at p. 353 [where § 654 applies (when sentencing an adult defendant), the sentence must be stayed even if imposed concurrently rather than consecutively].) Here, the juvenile court calculated appellant's maximum term of confinement by running the count 3 term consecutive to the count 2 term.

discussed *ante*, section 654 precludes extending the maximum term of confinement with a term on count 3.  Therefore, appellant's total maximum term of confinement should be 17 years eight months. The order of disposition shall be modified accordingly.

### C. Gang Condition

Appellant contends, as did his counsel at the dispositional hearing, that the gang conditions imposed by the juvenile court are unreasonable under *People v. Lent* (1975) 15 Cal.3d 481 (*Lent*) and *In re Ricardo P.* (2019) 7 Cal.5th 1113.  The record indicates otherwise.

#### 1. Background

##### a. *Probation Report*

In his report dated October 30, 2019, Contra Costa County Probation Officer Cesar Estrada-Ramirez advised that appellant admitted he had friends who were in gangs, including "Sacramento sect gangs, Piru gang, Bloods, Crips, and Norteños."  Appellant denied any gang membership or association, but acknowledged he wanted to " 'make better choices' with friends."  His "association with peers involved in gang conflicts" was concerning to the probation department.  Estrada-Ramirez wrote: "[Appellant's] mentality indicates he fails to see the risk in associating with individuals with gang ties.  This failure to choose prosocial peers, and display appropriate decision-making skills has led [appellant] to engage in risky behavior."

The probation report further advised that, according to victim Munger-Bounds, the dispute between Munger-Bounds and M.R. "originated after [Munger-Bounds] had brought a Sureño gang member to [M.R.'s] party," and M.R. "associated as a Norteño[]."  According to a Snapchat message stored on Munger-Bounds's phone, M.R. told Munger-Bounds that he was going to

11

"shoot [his] ass." The probation department was concerned that appellant's actions during the offense "indicated he was aware of [M.R.'s] threats to shoot the victim" and appellant "was the individual to carry out the threats."

The probation department recommended that appellant be committed to the Division of Juvenile Justice (DJJ), with participation in specified treatment and training.

### b. *Dispositional Hearing*

At the contested dispositional hearing on January 24, 2020, Sacramento County Probation Officer Eric Davis testified that he knew appellant from his residency in the maximum-security unit of the county's juvenile hall. Davis never heard appellant discuss a gang affiliation, but he had never asked appellant if he had one. Randal Broadhurst, the director of the Gang Awareness and Prevention program, saw appellant on a weekly basis during his relatively limited time in detention at the Sacramento Youth Detention Facility and did not recall appellant being affiliated with a gang; nor did his notes indicate appellant had a gang affiliation.

Probation Officer Estrada-Ramirez, however, testified that he had interviewed appellant and conducted a thorough assessment of his needs. While appellant "did not claim a specific gang membership," appellant said he "associated with individuals of a wide variety of gang affiliations." In addition, "the offense had an underlying issue with gangs," in that "one of the individuals was upset that the victim had brought somebody that was associated with a different gang to a party." Estrada-Ramirez expressed additional concern about appellant's substance abuse issues and troubling behavior at school, and he reiterated the probation department's recommendation that appellant be sent to DJJ.

12

The prosecutor told the court: "This is the type of behavior and the type of conduct that screams DJJ. This is the type of offense that typically is—sends people to DJJ."

The court, however, rejected the DJJ recommendation, ordered appellant to the county "Challenge Academy" program, and granted him probation. The court imposed the following gang-related probation conditions: "1) The Minor shall not be a member of any gang, meaning a 'criminal street gang' as defined in Penal Code Section 186.22(f), nor associate with any person known by the Minor to be a gang member. [¶] 2) The Minor shall not associate with anyone identified to the Minor in writing by his Probation Officer or parent as a person or persons to whom he/she is prohibited from contacting or associating with except in the form of incidental contact in a school setting or school-related activity. [¶] 3) The Minor shall not . . . be in the presence of any person or persons . . . who the Minor knows are gang members and possess a firearm, ammunition, or other deadly or dangerous weapons. [¶] (4) The Minor shall not be in any 'specific locations' where gang members are known by the Minor to meet or gather, or 'specific locations' known by the Minor for gang-related activity, or specified by his/her Probation Officer or parent in writing as involving gang-related activity, nor shall he/she participate in any gang-related activity. [¶] (5) The Minor shall not post, display or transmit through a computer, cellular phone or other means of electronic communication any symbols, photographs or other information that the Minor knows to be, or that the Probation Officer informs the Minor to be, gang-related. [¶] (6) The Minor shall not wear any clothing or emblems . . . that he/she knows are gang-related or that the Probation Officer informs him/her are gang related, including, but not limited to gang graffiti, symbols, photographs, members rosters or other gang

13

writings and publications.  [¶]  (7) The Minor shall not possess any paraphernalia that the Minor knows are gang-related or that the Probation Officer informs him/her are gang-related, including but not limited to gang graffiti, symbols, photographs, members rosters or other gang writings and publications.  [¶]  (8) The Minor shall not acquire any new tattoos, either permanent or temporary, that he/she knows to be, or that his/her probation Officer informs the Minor to be, gang related.  [¶]  (9) The Minor shall not be present at any Court proceeding that the Minor knows is gang-related unless the Minor is a party, defendant, or a subpoenaed witness or is permitted to be present by the Court or his/her Probation Officer."

        2. <u>Law</u>

Under Welfare and Institutions Code section 730, subdivision (b), a juvenile court may impose any reasonable condition that is "fitting and proper to the end that justice may be done and the reformation and rehabilitation of the ward enhanced."  The court has broad discretion to select appropriate probation conditions.  (*In re Josh W.* (1997) 55 Cal.App.4th 1, 5 (*Josh W.*).)  This discretion is designed to advance the minor's rehabilitation and preserve family ties.  (*In re Walter P.* (2009) 170 Cal.App.4th 95, 99–100.)  Further, minors require more guidance and supervision than adults, and their constitutional rights are more circumscribed.  (*In re Antonio R.* (2000) 78 Cal.App.4th 937, 941.)  The court may "impose a condition of probation that would be unconstitutional or otherwise improper so long as it is tailored to specifically meet the needs of the juvenile."  (*Josh W.*, at p. 5; see *In re Victor L.* (2010) 182 Cal.App.4th 902, 910.)

Nonetheless, a probation condition will be invalid if it "(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, *and* (3) requires or forbids conduct

14

which is not reasonably related to future criminality." (*Lent, supra*, 15 Cal.3d. at p. 486, italics added; *Ricardo P., supra*, 7 Cal.5th at p. 1119 ["[T]he *Lent* test governs in juvenile and adult probation cases alike"].)

### 3. Relationship to Appellant's Offense

As to the first prong of the *Lent* test, the gang conditions imposed by the juvenile court bore a relationship to appellant's crimes. M.R., who claimed association with the Norteños, wanted to fight Munger-Bounds for inviting a Sureño to his party and threatened to shoot him. Appellant accompanied M.R. to Munger-Bounds's home—armed with a loaded .38 caliber firearm—and stood by as M.R. fought with Munger-Bounds; when the fight had stopped and Munger-Bounds appeared the victor, appellant pulled out the gun from his jacket and shot Munger-Bounds in the stomach. A reasonable inference is that appellant was participating with M.R. in a defense of what they saw as an affront to the Norteños. Because of the relationship of his crimes to committing violence for the benefit of a gang, the probation conditions were valid. (See *Lent, supra*, 15 Cal.3d at p. 486.)

### 4. Reasonable Relation to Future Criminality

As to the third prong of the *Lent* test, the probation conditions were reasonably related to appellant's future criminality. Instructive in this regard is *In re Laylah K.* (1991) 229 Cal.App.3d 1496 (*Laylah K.*).

In *Laylah K.*, the minor Laylah and three other girls accosted a woman who was walking a dog, demanded to know why she was wearing red clothing, shouted obscenities at her, and challenged her to fight. Laylah hit the woman twice in the face. (*Laylah K., supra*, 229 Cal.App.3d at p. 1499.) The probation report recommended that gang conditions be imposed in regard to Laylah's probation, indicating that the offense had " 'gang overtones' " and noting a family member's conclusion that the defendants

15

were " 'gang associates' " if not gang members. (*Id.* at pp. 1500–1501.) In addition to the evidence that their victim was wearing red clothing, the defendants admitted they had friends who were members of the Crips gang and one of the defendants was a Crips member. (*Ibid.*) The juvenile court imposed the gang conditions on Laylah, even though there was no evidence she was a gang member. (*Ibid.*)

The court of appeal affirmed, ruling that the juvenile court "reasonably relied upon the probation officer's conclusion Laylah and [her co-defendant] participated in an apparent defense of what they perceived to be a symbolic challenge to Crips' territorialism." (*Laylah K., supra*, 229 Cal.App.3d at p. 1501.) The court rejected Laylah's argument that her mere association with gang members did not justify the conditions, observing that "[a]ssociation with gang members is the first step to involvement in gang activity." (*Id.* at p. 1501.) Noting that Laylah had displayed increasingly violent conduct and believing she was "in danger of succumbing to gang pressures," the court saw "no logical or beneficial reason to require a court to wait until a minor has become entrenched with a gang, only then to apply mere prophylactic remedies." (*Id.* at p. 1501.) The court concluded: "Where a court entertains genuine concerns that the minor is in danger of falling under the influence of a street gang, an order directing a minor to refrain from gang association is a reasonable preventive measure in avoiding future criminality and setting the minor on a productive course. Evidence of current gang membership is not a prerequisite to imposition of conditions designed to steer minors from this destructive path." (*Id.* at p. 1502.)

Here, as in *Laylah K.*, appellant's offenses had "gang overtones." (*Laylah K., supra*, 229 Cal.App.3d at p. 1500.) Although appellant did not admit being a gang member or associate, he had friends who were gang

16

members, he associated with M.R. (who associated with a criminal street gang), he accompanied M.R. in his attack on Munger-Bounds for inviting a rival gang member to a party, he arrived at the scene with a loaded gun, and he shot Munger-Bounds in defense of M.R.  In addition, the probation report warned that appellant failed to see the risk in associating with individuals with gang ties, and appellant acknowledged that he needed to make better choices with friends.  It was not irrational to conclude that appellant was in danger of falling under the influence of a street gang and would benefit from gang conditions as "a reasonable preventive measure in avoiding future criminality and setting [appellant] on a productive course."  (*Id*. at p. 1502.)

Appellant's reliance on *In re Edward B.* (2017) 10 Cal.App.5th 1228 is misplaced.  There, the court struck a gang condition where there was no evidence the defendant was a gang member *or* his friends affiliated with gangs, except statements by his father that the defendant's former friend had some involvement with a criminal street gang, an older individual reportedly drove the defendant around before the offense, and the father believed that the defendant had been instructed to commit the offense.  (*Id*. at p. 1234.)  Here, by contrast, appellant *admitted* that he had friends in many different gangs, and he pulled the trigger in a shooting precipitated by gang rivalry.  We find no abuse of discretion.

## III.  DISPOSITION

The jurisdictional order of October 9, 2019 is affirmed.  The dispositional order of January 24, 2020 is modified to reflect a total maximum confinement term of 17 years eight months; as so modified, the dispositional order is affirmed.

_____

NEEDHAM, J.


We concur.


_____

SIMONS, Acting P. J.


_____

REARDON, J. *


*In re J.A.* / A159453

_____

\* Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.