Filed 7/26/22  P. v. Pacheco CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. CHRISTIAN ANGEL PACHECO, Defendant and Appellant. | B317219 (Fresno County Super. Ct. No. F15906861) |

APPEAL from a judgment of the Superior Court of Fresno County, Timothy A. Kams, Judge.  Affirmed in part, reversed in part and remanded with directions.

John Steinberg, under the appointment of the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, A. Kay Lauterbach and R. Todd Marshall, Deputy Attorneys General for Plaintiff and Respondent.

————————————————

Defendant and appellant Christian Pacheco appeals his conviction of murder, with true findings on a firearm enhancement and a gang enhancement. Defendant argues: (1) there is insufficient evidence to support the gang enhancement; (2) alternatively, the gang enhancement and the murder conviction must be vacated in light of amendments to the applicable statute while his appeal was pending; (3) the trial court abused its discretion in declining to strike the firearm enhancement; and (4) the court erred in imposing fines and fees without first determining his ability to pay. We reverse the gang enhancement and remand for further proceedings, and otherwise affirm.

### FACTS AND PROCEDURAL BACKGROUND

**1.    *The Crime***

On October 30, 2015, around 3:00 p.m., defendant shot Juan Ortiz multiple times near an elementary school. Ortiz and his fiancée, accompanied by their 5-year-old daughter, were walking toward the school, to meet their son's school bus and walk him home.[1]

Defendant, a member of the Sureños gang, approached Ortiz and asked him, "Hey, fool, you bang?" Ortiz was a member of the Bulldogs, a rival gang. He responded to defendant's challenge with, "Yeah, Northside Selma Bulldogs." Defendant then pulled a gun from his shorts and shot Ortiz seven times. Ortiz subsequently died in the hospital; his cause of death was a bullet wound to the head.

After shooting Ortiz, defendant ran. As he fled, he wrapped a shirt around the gun to cover it. Defendant ran into a

---

[1]    Ortiz's son attended a different school, but the bus dropped him off nearby.

nearby apartment complex, which was claimed as Sureños territory.  Police spotted defendant and detained him in the apartment complex, in the company of a fellow gang member.

A number of witnesses had seen defendant shoot Ortiz or run from the scene.  After defendant was detained, he was identified in field show-ups by the victim's fiancée and several other witnesses.

Defendant had attempted to hide the gun by stashing it, still wrapped in the shirt, in the wheel well of a van parked in the apartment complex.  When a driver, unaware of the gun, drove the van from the complex's parking lot, the gun dropped to the street while the shirt remained stuck in the van.  Police recovered the gun.

## 2. *The Charges*

On April 1, 2016, defendant was charged with one count of murder (Pen. Code, § 187).[2]  The information also alleged that defendant intentionally discharged a firearm causing death (§ 12022.53, subd. (d)) and that he committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).  Defendant entered a plea of not guilty.

## 3. *Transfer Hearing*

Defendant was 17 years old at the time of the offense, but the charges had been filed directly in superior court.  However, in March 2017, in light of Proposition 57, defendant moved to remand the case to juvenile court.  Instead, the trial court set the matter for a transfer hearing to be held by a juvenile court judge.  The parties briefed the issue.

---

[2]     All further statutory references are to the Penal Code unless otherwise stated.

The briefing included the report of a psychologist, Richard A. Blak, Ph.D., who concluded that defendant was less mature than other 17 year olds, who are themselves immature in brain development and psychological functioning. Dr. Blak also offered the "Diagnostic Impression" that defendant had "Antisocial Personality Disorder," as well as a number of substance abuse disorders. Dr. Blak stated that defendant "would have met the criteria for a Conduct Disorder at the time of his offense. The essential feature of conduct disorder is a repetitive and persistent pattern of behavior by a child or teenager in which the basic rights of others or major age-appropriate societal norms or rules are violated."

The briefing for the transfer hearing also included several hundred pages of defendant's juvenile records, documenting his time in the juvenile justice system, including multiple sustained petitions, numerous probation violations, and a failure to make significant progress despite repeated opportunities to do so.

The juvenile court judge concluded defendant should be transferred to adult court for criminal prosecution.[3]

## 4. *Trial*

At trial, there was little dispute as to the facts. Defendant took the stand and admitted shooting Ortiz, although he claimed Ortiz had provoked and threatened him. According to defendant, Ortiz asked if defendant was going to use a gun on him in front of his daughter. Defendant was frightened that Ortiz was going to "pull out a gun and try to get" him. Defendant testified, "My body reacted to him coming at me and I defended myself."

---

[3] The juvenile court's transfer ruling is not an issue on appeal.

4

Defendant admitted being a member of the Sureños, but he suggested that this was when he was "young."

The main issue at trial was defendant's intent. The prosecution introduced evidence that, the day before the shooting, defendant had told his former girlfriend that he was planning to shoot someone. However, the former girlfriend declined to give a formal statement to police, out of fear, and ultimately recanted at trial.

The prosecution also called Fresno County Sheriff's Deputy Mark Fam, who testified as a gang expert on "the Sureno gang." He explained the history of the gang: the Mexican Mafia began as a Hispanic prison gang in the 1950s, but ultimately it split between northern California and southern California members. In 1968, the northern California members spun off into the Nuestra Familia (Norteño) gang, with the southern California members, still loyal to the Mexican Mafia, known as Sureños. There are approximately 70,000 Sureño members throughout California.

Deputy Fam testified that "Sureno gang members" wear the color blue, and often wear L.A. Dodgers' apparel (both for the color and the association with southern California), but also wear clothing associated with other sports teams that use the color blue. Sureño members have specific tattoos – including "SUR" meaning "South" or the number 13, which pays homage to the Mexican Mafia.[4] Deputy Fam identified, and displayed, hand signs and signals that Sureño members use to show they are Sureños. He identified rivals of the Sureños – the primary rivals being Nuestra Familia and Bulldogs.

---

[4] Deputy Fam testified that "individual hoods in the neighborhood" also have identifying tattoos.

Deputy Fam explained that "[s]ubsets are – the easiest way to think about it is neighborhoods. They will call them hoods, neighborhoods. It's just smaller geographical areas of the same gang typically controlled by a bigger gang." He explained that Sureños are territorial. They mark their territory with graffiti. Having a large territory enables the Sureños to sell drugs in the neighborhood and "run girls" in the neighborhood. When there are drug dealers in the neighborhood who are not part of the gang, they can tax the dealers. Deputy Fam testified that "Fresno County for the Surenos" is controlled by the Mexican Mafia, and that "[t]he guy who controls Fresno County is a guy by the name of Michael Boo Boo Moreno. He's locked up right now in San Bernardino County Jail fighting a federal case. Every Sureno in Fresno County pays taxes, and some of that taxes makes its way up to Mike Boo Boo Moreno."

Deputy Fam testified that the primary activities of "the Sureno Gang" include "everything from murder down to assault with a deadly weapon, and victim or witness intimidation, down to burglary."

In order to establish in the present case that Sureños had committed the necessary predicate offenses under the gang enhancement statute, the prosecution elicited Deputy Fam's testimony on three prior offenses committed by Sureño members: (1) a January 2010 murder committed by a member of the "Barrio Sanger Sureños" -- Sanger is a city in the area which is "the biggest stronghold for the Surenos in Fresno County"; (2) a July 2010 murder committed by a "member of Sureños from the west side of Fresno county"; and (3) a 2013 unlawful discharge of a firearm, committed by "a Sureno from, SLS, Sureno Lifestyle, hood." Although the prosecution elicited evidence of the 2013

6

unlawful discharge of a firearm, the jury was instructed that only the murders were alleged to be predicate offenses under the gang enhancement statute. Likewise, the prosecutor relied on only the murders in her argument to the jury.

Defendant was a member of the Sureños gang, and, specifically, the Barrio Selma Locos subset. Detective Fan explained that Barrio Selma Locos is "a neighborhood, a hood, a subset of the Sureno gang."

When presented with a hypothetical based on the facts of this shooting, Deputy Fam offered his opinion that the crime "would benefit the criminal street gang and further their activities." Specifically, he testified that, at its most basic level, the killing of Ortiz "eliminated a rival. There's one less of that gang there that can fight them, do harm against them." But, he added, there were a lot of other effects. Specifically, because the crime happened in front of a school, it was "going to have a very long-lasting effect on the community. Anyone who observed that is probably going to have some kind of trauma, some type of a psychological effect. It doesn't only enhance the status of that individual it enhances the status of the entire gang. Things like this typically get out by word of mouth, by social media, and by the regular media. So people are going to hear about this. And the brazen activities and the violent activities of that gang who committed the crime are going to get out to that community as well. And like we talked about earlier, part of the gang culture is keeping people from testifying. Keeping people from wanting to cooperate with law enforcement. Something like this will have that effect on people. If you just saw someone get shot in front of the school, you want to be put up on the stand and testify against

7

that individual.  He's willing to do that to that person, what's he willing to do to you?"

The jury found defendant not guilty of first degree murder, but guilty of second degree murder, with the firearm and gang enhancements true.

## 5.    *Sentencing and Appeal*

Prior to sentencing, the prosecution submitted a statement in aggravation and addendum for a future youthful offender parole hearing.  The statement attached numerous exhibits, including the paperwork documenting defendant's juvenile history and Dr. Blak's report previously submitted in connection with the juvenile transfer hearing.

The report of the probation officer recommended a prison term of 15 years to life for the murder, enhanced by 25 years to life for the firearm enhancement, plus an additional 10-year determinate term for the gang enhancement.

At the sentencing hearing, the prosecutor argued against the latter recommendation.  Because the gang enhancement was attached to a crime (murder) for which defendant would receive an indeterminate term, section 186.22, subdivision (b)(5) applied, and provided that defendant "shall not be paroled until a minimum of 15 calendar years have been served."[5]  Because

---

[5]    The sentence enhancement provided in section 186.22, subdivision (b) varies depending on the offense and the type of sentence (determinate or indeterminate) imposed.  Subdivision (b)(1) provides for different enhancement terms depending on the type of offense, "[e]xcept as provided in paragraphs (4) and (5)." Under subdivision (b)(1)(C), the enhancement term for a violent felony is 10 years.  However, subdivision (b)(5) provides that, if the offense is "a felony punishable by imprisonment in the state prison for life," the enhancement is instead that the defendant

defendant would already be sentenced to 15 years to life for the murder plus 25 years to life for the firearm enhancement, the 15 year minimum parole eligibility imposed by the gang enhancement would have no practical effect on his sentence. The prosecution specifically argued that it was asking the court not to stay the firearm enhancement.

Defense counsel stated that the gang enhancement "shouldn't apply." Counsel also requested that the firearm enhancement "not be imposed as well. I know Mr. Pacheco is very young at the time. I know the jury verdict didn't necessarily reflect any provocation from the victim in this case, but Mr. Pacheco testified to such. So I'd submit it on that."

The trial court responded, "The Court recognizes it has discretion to strike the use of a firearm enhancement. In this case the Court respectfully declines that request. This crime involved great violence. In the Court's view, this attack was unprovoked despite what Mr. Pacheco claims. It was carried out in front of a school full of children being excused for the day. The victim's young daughter was mere feet away when the father was murdered. The crime was in the Court's view too cruel and callous for me to grant the Defendant's request to strike the use of a firearm."

The court stated that the parties agreed that the 10-year determinate gang enhancement did not apply "and therefore the Court will not impose any time for that." The court sentenced

"shall not be paroled until a minimum of 15 calendar years have been served." Here, the probation report erroneously suggested the 10-year determinate enhancement term applied; the prosecutor correctly argued that the 15-year minimum parole date was applicable.

defendant to 15 years to life for the murder enhanced by 25 years to life for the firearm enhancement.

The court imposed a $10,000 restitution fine (Pen. Code, § 1202.4, subd. (b)) and a $10,000 parole revocation fine (Pen. Code, § 1202.45), in addition to a $6,575 payment to the victim compensation fund. A $40 court security fee (Pen. Code, § 1465.8) and a $30 criminal conviction assessment (Gov. Code, § 70373) were also imposed. Defendant made no argument regarding his ability to pay. Nonetheless, the trial court stated, "In regards to the restitution fine, as well as restitution, it is substantial, but so are the expenses for funeral and so forth for the victim. In the Court's view, the Defendant, who [is] a young man, appears healthy and able to work and earn money at prison to pay his restitution fines, as well as restitution."

Defendant filed a timely notice of appeal.

## DISCUSSION

On appeal, defendant argues error in the imposition of the gang enhancement on two grounds. First, the evidence was insufficient to support the gang enhancement under principles announced in *People v. Prunty* (2015) 62 Cal.4th 59, dealing with gang subsets. Second, the gang enhancement must be vacated under recent amendments to section 186.22.[6] Third, the failure to bifurcate the trial, so that the gang enhancement was tried after the substantive defense, requires reversal of the conviction.

---

[6] While this appeal was pending, the Legislature passed Assembly Bill No 333 (AB 333), which modified the language of the gang enhancement statute. At our request, the parties filed supplemental briefs. Defendant argues that the AB 333 amendments are applicable to him and require vacatur of the gang enhancement.

10

Defendant then raises two sentencing issues: the failure to strike the firearm enhancement and the imposition of fines and fees without a determination of his ability to pay.

I.

GANG ENHANCEMENT ISSUES

**A.  *The Gang Enhancement Must Be Reversed in Light of the Requirements of AB 333***

Defendant's challenges to the gang enhancement encompass both an element of the enhancement that was in existence at the time of trial and elements retroactively applicable post trial due to AB 333.  Although we conclude that reversal is necessary because the AB 333 requirements were not met, we must also address whether the evidence was sufficient to establish the gang enhancement at the time of trial.  This is so because, if the sole error is in meeting the requirements of the new statute, the prosecution may retry the enhancement, but if the evidence was insufficient to meet the requirements of the statute at the time of trial, there can be no retrial.  (*People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1033 (*Vasquez*).)

> *1.  The Evidence Was Sufficient to Establish the Predicate Offenses Under the Gang Enhancement in Effect Prior to the AB 333 Amendments*

In order to prove a gang enhancement, the prosecution must establish that the defendant committed his offense "for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subd. (b)(1).)  A "criminal street gang" is defined as an ongoing association or group of three or more persons, having as one of its primary activities the commission of certain criminal acts, "having a common name or common identifying sign or symbol," and whose members have engaged in

11

a "pattern of criminal gang activity." (§ 186.22, subd. (f).) A "pattern of criminal gang activity" in turn, means the commission of "two or more" statutorily listed offenses.[7] (§ 186.22, subd. (e)(1).)

In this case, the prosecution sought to establish that the "criminal street gang" at issue was the Sureños. To that end, Deputy Fam testified to the primary activities, common name and common identifying signs and symbols of the Sureños. And the prosecution sought to establish predicate offenses which had been committed by members of the Sureños.

On appeal, defendant argues that, because he was a member of "Barrio Selma Locos" and the predicate offenses were committed by members of other Sureños subsets, the evidence was insufficient to prove that the predicate offenses were committed by members of the same gang in which defendant was a member.[8]

Specifically, relying on *People v. Prunty, supra*, 62 Cal.4th 59, defendant argues that the prosecution failed to establish that the different Sureño subsets were part of the same umbrella gang, as there was no evidence of collaborative activities or collective organizational structure.

But the prosecution did not proceed on the basis that the Sureño subsets were different, but related, gangs; the prosecution presented evidence that the Sureños itself was the gang involved

---

[7] These requirements existed in the statute as of the time of trial. AB 333 added additional requirements to the "pattern of criminal activity," which we shall discuss below.

[8] This argument is not based on the AB 333 amendments to section 186.22.

in the current and predicate offenses.  The so-called subsets were merely "neighborhoods," that are "smaller geographical areas of the same gang typically controlled by a bigger gang."  Further, to the extent the evidence at trial demonstrated the existence of an informal sub-group, that is, the Sureños of Fresno county, Detective Fan testified that these members were controlled by Michael Boo Boo Moreno and "[e]very Sureno in Fresno County pays taxes, and some of that taxes makes its way up to [Moreno]."

Here, defendant shot Ortiz to benefit the Sureño gang.  He testified that he was in "the Surenos."[9]  In addition, the prosecution introduced a photograph of defendant wearing blue clothing, which was consistent with membership in the Sureños, and a hat with the numbers "559," the area code for Fresno county.

There was also sufficient evidence that the predicate murders were committed by the Sureños gang.  The gang expert testified that July 2010 murder was committed by "a member of Surenos from the west side of Fresno County."  The murder arose when "[s]everal Surenos decided to confront" a Bulldog at a quinceañera.  The second predicate murder was committed in January 2010, by a member of "Barrio Sanger Surenos," which was based in Sanger, "the biggest stronghold for the Surenos in Fresno County."  According to the gang expert, the defendant in

---

[9]    Defendant's testimony was elicited by his counsel as follows:

"Q    Have you been in a gang?
"A    Yeah.
"Q    And was that the Surenos?
"A    Yeah."

Defendant did not testify his gang was Barrio Selma Locos; he said that his gang was the Sureños.

that case was confronted by some Bulldogs, left, saw them walking down the street and yelled out, " 'What's up ese'—ese is what the Surenos will refer to each other as for the letter S—at the group of Bulldogs and started shooting at them."  Further, even insofar as the perpetrators are viewed as members of Sureño subset gangs, there was sufficient evidence here, unlike in *Prunty*, that the perpetrators were "united by something in common beyond pure happenstance" (*Prunty,* 62 Cal.4th at p. 73), including their payment of taxes and loose hierarchy under the control of Moreno (*id.* at p. 77).

> 2.  *The AB 333 Amendments on the Timing of Predicate Offenses and "Gang Benefit" Apply Retroactively to Defendant*

While this appeal was pending, the Legislature enacted AB 333, which amended section 186.22, the gang enhancement statute.  We requested letter briefing on the effect of AB 333.  Defendant argues and the Attorney General concedes that the AB 333 amendments to section 186.22 regarding the definition of "gang benefit" and the timing of the predicate offenses are retroactive.  (*People v. Delgado* (2022) 74 Cal.App.5th 1067, 1087; *People v. Lopez* (2021) 73 Cal.App.5th 327, 334.)  Given the parties' agreed framing of the issue, we will assume, without deciding, that the two amendments are retroactive.

Defendant argues that substantial evidence did not support the two AB 333 requirements.  First, he challenges the evidence of benefit to the gang. Second, he questions the sufficiency of the predicate offenses under the new law.

*(a)     There Was Indisputable Gang Benefit Beyond Reputation*

Both before and after its amendment by AB 333, section 186.22 applied only to a defendant who committed a felony "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in" criminal conduct by gang members.  (§ 186.22, subd. (b)(1).) AB 333 added a new definition, explaining, "to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  (§ 186.22, subd. (g).)

Defendant argues that the prosecution relied on evidence of reputational benefit to the gang, which is inadequate under the new law.  The Attorney General agrees that the gang benefit must be more than reputational under AB 333, but argues that the benefit to the Sureños here was far more than reputational. Because the trial took place before the AB 333 amendments, defendant's jury was not instructed on the "non reputational" element.  So, the issue before us is whether the failure to give such an instruction was prejudicial.

"By requiring proof for a gang enhancement that the benefit to the gang was more than reputational, Assembly Bill No. 333 essentially adds a new element to the enhancement. When jury instructions are deficient for omitting an element of an offense, they implicate the defendant's federal constitutional rights, and we review for harmless error under the strict

15

standard of *Chapman v. California* (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (*Chapman*). [Citations.]" (*People v. Sek* (2022) 74 Cal.App.5th 657, 668.) "Under the *Chapman* standard, reversal is required unless 'it appears beyond a reasonable doubt that the error did not contribute to th[e] jury's verdict.' [Citation.]" (*Ibid*.) The issue is not whether, in a trial without the error, a guilty verdict would have been rendered. Instead, the issue is whether the guilty verdict actually rendered in the case was surely unattributable to the error. (*Ibid*.) "Courts have found harmless error under this standard where the missing element from an instruction was uncontested or proved as a matter of law." (*Id*. at p. 669.)

That standard is met here – any error was harmless beyond a reasonable doubt. It is true that the gang expert testified to the benefit the gang would have received from the fear and trauma suffered by the community. Even if we were to assume without deciding that frightening and traumatizing the community is reputational, the expert also testified that the gang benefitted because defendant eliminated a member of a rival gang. "[T]argeting a perceived or actual gang rival" is expressly identified in the statute as a benefit that is more than reputational. (§ 186.22, subd. (g).) There is no dispute that defendant was a Sureño; that Ortiz was a Bulldog; and that the two gangs were rivals. The victim's fiancée testified that defendant approached Ortiz and said, "Hey, fool, you bang?" Ortiz responded in kind. Although defendant testified that he did not issue the gang challenge or shoot Ortiz for gang reasons – instead claiming he acted in self-defense – the jury's rejection of self-defense establishes that the jury did not accept this testimony.

16

> (b)   *Due to the New Temporal Element for Predicate Offenses, the Gang Enhancement Must Be Reversed But May Be Retried*

AB 333 also changed the temporal requirement for predicate offenses.  Now, to establish a pattern of criminal activity, the prosecution must show the commission of two or more itemized offenses "provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense *and within three years of the date the current offense is alleged to have been committed . . . .*" (§ 186.22, subd. (e)(1), italics added.)

Because the trial took place before the effective date of AB 333, the jury was not instructed on this temporal element.  As with the new element of gang benefit beyond reputational harm, we review the failure to instruct under the *Chapman* standard. The Attorney General argues that the error here is harmless beyond a reasonable doubt, because it had introduced evidence at trial that necessarily established predicate offenses which satisfy the new temporal element.

Defendant shot Ortiz on October 13, 2015.  The two murders relied upon as predicate offenses occurred in 2010, and neither satisfies the new element that at least one of the predicate offenses occurred within three years of the date of the current offense.  The Attorney General argues that this recency requirement is satisfied by a third predicate offense of which it introduced evidence at trial:  the April 2013 conviction of unlawful or negligent discharge of a firearm, committed by Mario Canales, a Sureño member from the Sureño Lifestyle hood.  April 2013 is within three years of the July 2010 murder, and also within three years of the current October 2015 Ortiz killing.

17

Under the AG's theory, the two predicate offenses would have met the temporal requirements.

However, to constitute a predicate offense sufficient to establish a pattern of criminal activity, the offense must be itemized in subdivision (e)(1) of section 186.22, and unlawful or negligent discharge of a firearm is not on that list. We sought additional briefing on the issue. The Attorney General argued that, although negligent discharge of a firearm is not on the statutory list of predicate offenses, the circumstances of gang member Canales's offense showed that he also violated section 25850, carrying a loaded firearm in a public place, which qualifies under the statute. (§ 186.22, subd. (e)(Z).)[10] Specifically, at trial, Deputy Fam was asked if he as familiar with the facts of Canales's conviction. He responded, "Yeah, he – our patrol took a call for service of shots fired, and one of our deputies stopped the vehicle leaving the area which contained this individual, Mario Canales. He admitted to seeing someone that he had issues with standing in his front yard so he pulled out a gun and fired it several times in the air to scare him."

The Attorney General rightly points to language in section 186.22 indicating that predicate offenses need only be committed; there need not be an actual conviction. (§ 186.22, subd. (e)(1) [" 'pattern of criminal activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of" the predicate

_____

[10] Section 186.22, subd. (e)(Z) provides: "Carrying a loaded firearm in violation of Section 12031 until January 1, 2012, and, on or after that date, Section 25850." Both former section 12031 and current section 25840 require the carrying of a loaded weapon to be "in any public place or on any public street."

offenses].)  The Attorney General also argues that, regardless of the crime for which Canales was convicted, the facts show that Canales also committed the predicate offense of carrying a loaded firearm.

While we agree that the prosecution at defendant's trial introduced some evidence from which a jury might have concluded Canales committed the crime of carrying a loaded firearm in public, that is not the test.  As we discussed above, "[c]ourts have found harmless error under [the *Chapman* test], where the missing element from an instruction was uncontested or proved as a matter of law." (*People v. Sek, supra*, 74 Cal.App.5th at p. 669.)  We cannot say that Deputy Fam's brief testimony regarding the facts of Canales's arrest proved as a matter of law that Canales committed the crime of carrying a loaded firearm in a public place.  Deputy Fam simply recounted a statement Canales allegedly made to an unidentified deputy.  It is not clear how Deputy Fam obtained his knowledge of the statement purportedly made by Canales to the other deputy, nor was there any evidence of the circumstances in which the statement was made or whether it was documented.  Beyond that, the statement, as Deputy Fam relayed it, does not inexorably point to Canales having carried the loaded firearm in a *public* place.  According to Deputy Fam, Canales "admitted to seeing someone . . . standing in his front yard so he pulled out a gun and fired it . . . ."  It is unclear whether this occurred in Canales's front yard or the victim's, and, if Canales's yard, whether it was gated or otherwise blocked off from the street. (See *People v. Strider* (2009) 177 Cal.App.4th 1393, 1400−1405 [fenced front yard is not a public place for purposes of prohibition of carrying a loaded firearm in a public place].)

19

The prosecution supported its proof of Canales's predicate act with Exhibit 90, which contained the felony complaint against Canales, and paperwork documenting his no contest plea. The exhibit shows that Canales was charged with a number of offenses, including both unlawful discharge of a firearm and carrying a loaded firearm in public, but that he pleaded no contest only to the former, not the latter. On this evidence, we cannot say it was uncontested or proven "as a matter of law" (*People v. Sek, supra*, 74 Cal.App.5th at p. 669) that Canales committed the offense of carrying a loaded firearm in public. As such, the temporal element added by AB 333 was not satisfied, and the failure to instruct on the element was not harmless beyond a reasonable doubt. We therefore reverse the gang enhancement. As this temporal element was not part of the law at the time of trial, on remand, the prosecution may elect to retry the gang enhancement. (*People v. Vasquez, supra*, 74 Cal.App.5th at p. 1033.)

**B.**  ***The Reversal of the Gang Enhancement Does Not Require Reversal of Pacheco's Murder Conviction***

Defendant contends that our reversal of the gang enhancement requires reversal of his underlying murder conviction as well. Relying on *People v. Burgos* (2022) 77 Cal.App.5th 550, 557–558, review granted July 13, 2022, S274743 (*Burgos*), he argues in a supplemental letter brief, "Assuming section 1109 applies retroactively to appellant's case, this Court should also reverse his convictions of murder and the gang enhancement, whether under federal or state harmless error analysis."

AB 333 amended section 186.22 in several respects. We have already discussed two of them – definition of "gang benefit"

20

and time limits for predicate offenses. We hold that application of the latter, but not the former, compels reversal of the gang enhancement. A third part of AB 333 amended a different section of the Penal Code, section 1109, that now requires, upon a defendant's request, crimes charged against a defendant must be tried separately from the gang enhancement. In supplemental briefing, defendant takes the position that the bifurcation provision must also be applied retroactively. (See also *People v. Montano* (2022) 80 Cal.App.5th 82, ___ [2022 WL 2236331, *16] *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128, 1131.) The People, relying on *People v. Perez* (2022) 78 Cal.App.5th 192, 207, disagree (See also *People v. Ramirez* (2022) 79 Cal.App.5th 48, 64-65.),

We need not take a position in this dispute. Defendant did not move to bifurcate the trial, thereby forfeiting the argument. (See *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 772 [as a general rule, the failure to object in the trial court waives the right to assert error on appeal].) Defendant suggests that, prior to section 1109, a motion to bifurcate would have been futile or unsupported by the law then in existence. Defendant's bald representation does not make it so. Our Supreme Court acknowledged in 2004 that trial courts possessed the discretion to bifurcate gang enhancements. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Indeed, the defendants in *Ramos*, a case cited by defendant, had moved to bifurcate, even though their trial predated section 1109. (*Ramos*, *supra*, 77 Cal.App.5th at p. 1121.)

Even if we were to consider the merits of the argument, we would find the failure to bifurcate harmless under any standard of review. Critical parts of the gang testimony would have been

21

admitted in the first stage of any bifurcated trial. The encounter that led up the shooting started when defendant asked the victim Ortiz, "Hey, fool, you bang?" Ortiz was a member of the Bulldogs, a rival gang. He responded to defendant's challenge with, "Yeah, Northside Selma Bulldogs." The principal disputed issue at trial was defendant's intent. Defendant claimed self-defense. The prosecution argued this was an intentional gang shooting and introduced evidence that, the day before the shooting, defendant had told his former girlfriend that he was planning to shoot someone. This evidence was admissible on the key issue at trial – did defendant intentionally shoot Ortiz.

The other gang evidence was limited and relatively unimportant. The prosecution did not introduce other crimes that defendant had committed or participated in on behalf of his gang. Instead, the predicate offenses involved other Sureños members that took place over several years and in which defendant played no part. Accordingly, at least under these circumstances, we do not share the concern of the *Burgos* majority that it can be "difficult to determine how the outcome of the trial would have been affected if it had been bifurcated to try the gang enhancements separately . . . ." (*Burgos, supra*, 77 Cal.App.5th at p. 568.)

## II.
## SENTENCING ISSUES

### A. *The Court Did Not Abuse Its Discretion in Declining to Strike the Firearm Enhancement*

Defendant next contends the trial court abused its discretion in declining to strike the firearm enhancement at sentencing. In this regard, defendant relies on his age at the

22

time of the offense (17) and the psychological factors identified in Dr. Blak's report.

Defendant was sentenced in 2019. By this time, the Legislature had amended the law to provide trial courts with discretion to strike firearm enhancements in the interests of justice. (§ 12022.53, subd. (h), as amended by Stats. 2017, ch. 682 (S.B. 620), § 2.) We review a refusal to strike an enhancement for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 371.) We find no abuse of discretion. The trial court at sentencing correctly and expressly recognized it possessed this discretion, but declined to exercise it, on the basis that the crime was an unprovoked act of great violence that reflected cruelty and callousness. Defendant approached Ortiz in the middle of the day, when the victim was walking next to his fiancée and his daughter to meet his son's school bus. Defendant brought gang violence to a scene of children peacefully walking home from school, killing a parent in front of his daughter and causing an entire school to be placed on lockdown. That defendant happened to be three months shy of majority at the time does not create a mandatory duty on the trial court to strike the enhancement.[11]

B. ***The Trial Court Did Not Err in Connection with the Fines and Fees***

Defendant argues that, under *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1172, the trial court erred in imposing fines and fees without making a finding that he had the ability to pay. Defendant's premise is incorrect. At the sentencing hearing, the court expressly stated that defendant "appears healthy and able

---

[11] According to the probation report, defendant was born February 4, 1998. He killed Ortiz on October 30, 2015.

to work and earn money at prison to pay his restitution fines, as well as restitution."   There was therefore no error.

## C.   *The Abstract Must Be Modified*

Although not raised by the parties, we find two entries in the abstract of judgment that must be stricken.  First, the abstract does not reflect defendant's sentence was enhanced for the gang enhancement.  The abstract is correct only in light of disposition of this appeal.  Although the abstract does not mention the gang enhancement, it does reflect a sentencing consequence arising from the gang enhancement – defendant was directed to register pursuant to section 186.30.  Because we reverse and remand the gang enhancement, the registration requirement must be stricken, subject to the re-imposition of the registration requirement if the People elect to re-try the gang enhancement and it is found true.

We also have found an apparent clerical error in the abstract of judgment.  The abstract properly reflects defendant was sentenced to a term of 15 years to life for the murder, with an enhancement of 25 years to life for the firearm.  However, there is a box checked at the bottom of the abstract indicating that defendant was sentenced pursuant to "PC 667(b)-(i) or PC 1170.12."  Those statutory references are to the so-called "Three Strikes" law.  Defendant was not sentenced pursuant to The Three Strikes law.  That part of the abstract must also be stricken.

24

### *DISPOSITION*

The gang enhancement is reversed, and the matter remanded with directions that the prosecution may elect to retry the gang enhancement if it chooses. The court shall prepare an amended abstract of judgment removing the reference to the Three Strikes law. Unless the prosecution elects to re-try the gang enhancement and the enhancement is found to be true, the court shall also delete the reference to the gang registration requirement in the amended abstract of judgment. The trial court is directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

RUBIN, P. J.

WE CONCUR:

BAKER, J.

KIM, J.

25